In re **METRO TRANSPORTATION COMPANY t/a Yellow Cab Company,** Debtor.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION,** Plaintiff and Defendant on Counterclaim,

v.

**METRO TRANSPORTATION COMPANY t/a Yellow Cab Company,** Defendant and Plaintiff on Counterclaim.

**Bankruptcy No. 86–03618K.**
**Adv. No. 86–0945K.**

United States Bankruptcy Court, E.D. Pennsylvania.

Sept. 29, 1986.

call or demand certificates of public convenience to Metro Transportation Co., t/a Yellow Cab Co., the Debtor in this proceeding, authorizing the operation of eight hundred (800) taxi-cabs in the city of Philadelphia.

2. The Debtor, on account of the issuance of the aforesaid certificates, operates or have the authority to operate, approximately half of the taxicabs serving the city of Philadelphia at this time.

3. On September 30, 1985, Balboa Insurance Company (hereinafter "Balboa") filed with the PUC a certificate of insurance on the Debtor's behalf, effective October 1, 1985, evidencing that it was renewing insurance coverage to the Debtor which met the insurance requirements of the law of the Commonwealth.

4. On October 12, 1985, the Debtor filed a self-insurance application requesting the PUC to review and approve the self-insurance components of the Debtor's insurance plan under the Balboa policy.

5. On July 2, 1986, the PUC received a notice of cancellation of insurance, which advised that Balboa's insurance coverage issued to the Debtor would be cancelled, effective August 1, 1986.

6. On July 29, 1986, the Debtor filed the instant bankruptcy case seeking reorganization under Chapter 11 of the Bankruptcy Code, principally to attempt to resolve the crisis which would result if Balboa's insurance were cancelled on August 1, 1986.

7. On July 29, 1986, this Court, per Chief Judge Emil F. Goldhaber, issued a Temporary Restraining Order requiring Balboa to continue its insurance coverage of the Debtor through August 6, 1986, and, on August 6, 1986, Judge Goldhaber of this Court issued an Order adopting the Stipulation of the Debtor and Balboa which required Balboa to continue insurance coverage until October 1, 1986, and prohibited the Debtor from filing a complaint for injunctive relief requesting this Court to continue Balboa's insurance coverage after October 1, 1986.

Alan Kohler, Debra Paist, Asst. Counsel, Pennsylvania Public Utility Com'n, Michael C. Schnierle, Deputy Chief Counsel, for Prosecutory Staff of the PUC, Harrisburg, Pa., Karen Oill Moury, Asst. Counsel, for Public Utility Com'n.

John S. Estey, David H. Marion, Marvin Krasny, Douglas H. Weiss, Philadelphia, Pa., for debtor.

Mary F. Walrath, Philadelphia, Pa., for Official Creditors' Committee.

## OPINION OF THE COURT

DAVID A. SCHOLL, Bankruptcy Judge.

### I. FINDINGS OF FACT

1. On January 26, 1982, the Pennsylvania Public Utility Commission (PUC) entered an order issuing eight hundred (800)

8. On August 12, 1986, the PUC filed the Complaint for Declaratory Order in the instant case, and the matter was scheduled for a hearing on October 8, 1986.

9. On August 4, 1986, the Debtor amended its October 12, 1985, self-insurance application so as to request the PUC to review and approve a revised self-insurance plan, contemplating no participation by a qualified insurance company. Hearings on this Application were scheduled before PUC Administrative Law Judge (ALJ) Herbert Smolen.

10. On August 6, 1986, the Debtor filed a proposed increase in its shared-ride tariff, which the PUC has suspended, pending investigation. On August 18, 1986, the Debtor also filed a Petition for Immediate Rate Relief, seeking a twenty-five cent (25¢) increase in its metered cab-ride rates, upon which the PUC has also rendered no ruling.

11. After a pre-hearing conference before ALJ Smolen on August 11, 1986, Counsel for the Debtor and the PUC prepared and executed, on August 25, 1986, a Settlement Agreement, a copy of which is attached as Appendix "A" to the Order accompanying this Opinion. That Agreement states, inter alia, that "the parties have agreed, ... that the plan of self-insurance described in this Agreement *provides adequate protection to the public, ...*" and that the only issue to be decided by ALJ Smolen was whether the Debtor "has put forth adequate evidence of its financial capacity to fund the plan on an ongoing basis, ..." (emphasis added).

12. After a hearing on August 25, 1986, before him, ALJ Smolen, on September 12, 1986, issued an Initial Decision recommending that the PUC deny the Debtor's Application, principally because of his finding that "[t]he proposed self-insurance program, as submitted, does not adequately protect the interests of Metro's patrons and/or the general public." The Application was listed for disposition by the PUC on the ALJ's recommendation on September 25, 1986.

13. On September 19, 1986, both the PUC and the Debtor requested that this Court expedite the October 8, 1986, hearing on the Complaint previously filed in this matter, and the Debtor, for the first time, asserted and filed its Counter-Claim, requesting declaratory and injunctive relief. In response, the Court scheduled and conducted a hearing on September 24, 1986.

14. On September 25, 1986, the PUC entered an Order accepting the ALJ's recommendation to deny the Debtor's Application for self-insurance, adopting a revised Motion by PUC Chairman Linda C. Taliaferro stating that "Metro has not submitted sufficient evidence to establish that its proposed plan will adequately protect the travelling public or that it could fund it."

15. The Motion of Chairman Taliaferro did allow that cab drivers "participating in Metro's Installment Settlement Agreement adopted July 29, 1986" could temporarily operate for a 90–day period, provided that they file evidence of required insurance before operating.

16. This Installment Settlement Agreement, which the PUC has asked this Court to approve in a separate adversarial proceeding, Adversary No. 86–0946K, pertains to holders of approximately two hundred (200) of the Debtor's eight hundred (800) certificates. There is no evidence as to whether the cab driver participants in the Installment Settlement Agreement have or could obtain insurance, and the Court finds that most, if not all, would be unable to do so.

17. Denial of relief to the Debtor would, in all likelihood, cause the Debtor to cease doing business and result in a liquidation process in which the Debtor would attempt to sell its eight hundred (800) certificates in market conditions which the Court finds are very poor, due to the crisis which exists in obtaining insurance for taxi-cabs.

18. The Official Creditors' Committee in these proceedings has urged that the PUC and this Court allow the Debtor to continue to operate under the self-insurance program embodied in the Settlement Agreement of August 25, 1986.

19. Denial of the relief sought by the Debtor would greatly adversely affect creditors' interests, as it would not only threaten, but almost assure, significant loss to the assets of the Debtor's estate.

20. If the Debtor discontinues doing business, most, if not all, of approximately one thousand two hundred and fifty (1,250) drivers of Yellow Cab taxi-cabs would be out of work, plus approximately two hundred and fifty (250) other employees of the Debtor as mechanics, dispatchers, and office and administrative employees of the Debtor would lose their jobs as well.

21. The supply of public transportation in the city of Philadelphia, diminution of which is also threatened by financial difficulties of the Southeastern Pennsylvania Transportation Authority (SEPTA), would be significantly reduced by the loss of about half of the present fleet of available taxi-cabs, if relief were denied to the Debtor.

22. The stipulation of PUC staff in the Settlement Agreement of August 25, 1986, that the Debtor's self-insurance plan provides adequate protection to the public suggests that there is some question as to whether the interests of future claimants against the Debtor will not in fact be adequately protected if the Debtor is permitted to operate under the plan set forth in the Agreement, provided that its financial ability to comply with the terms of the Agreement is carefully monitored by the PUC and this Court, and it is allowed to continue to do business only so long as it complies therewith.

23. Balancing the several public interests in issue, the public interest on the whole would best be served by granting the relief sought by the Debtor.

## II. CONCLUSIONS OF LAW

1. As the parties agree, this Court has jurisdiction in this proceeding per 11 U.S.C. § 105(a), 28 U.S.C. § 157(b)(2)(A), 28 U.S.C. § 1334(a), and Bankruptcy Rule 7001(9).

2. While the PUC is hereafter not subject to the automatic stay provided in 11 U.S.C. § 362(a) due to the fact that its Complaint in this action may be construed as an action seeking relief from any such stay, this Court has the power to impose relief in the nature of a stay of any actions, including those of governmental bodies, which threaten the assets of the debtor's estate, pursuant to 11 U.S.C. § 105(a).

3. Although a bankruptcy court should utilize its powers under 11 U.S.C. § 105(a) sparingly, such powers are properly exercised in this case, subject to the conditions set forth in the Settlement Agreement which will minimize the risk to the public found by the PUC in its decision-making process.

4. The Debtor, as well as the creditors of the Debtor and the public, would suffer immediate and irreparable harm if the relief sought herein were denied, and therefore, an injunction, as requested by the Debtor in its Counterclaim, must be issued pursuant to Bankruptcy Rule 7065 and Federal Rule of Civil Procedure 65(d).

## DISCUSSION

This case presents a balancing of powers between a state regulatory agency and a federal bankruptcy court. Such disposition is clearly not, as has been suggested to us by a layman, a matter of whether a federal court is "more powerful" than a state agency, but requires a delicate balancing of interests and interpretation of our powers under the Bankruptcy Code.

Fortunately, although time constraints have required us to make a decision in a difficult area more quickly and with less extended consideration than we would otherwise have liked, we have been greatly aided by presentations by most able counsel representing the PUC, the Debtor, and the Committee of Creditors of the Debtor. Counsel have submitted Memoranda and presented argument which were thorough, candid, and free from posturing, or discussion of irrelevant facts and issues, which were very helpful to the Court.

Many of the Courts considering other cases which involved similar conflicting interests have been forced to devote atten-

tion to contentions by governmental agencies that bankruptcy courts have no power whatsoever, irrespective of the claims and circumstances present, to affect their decision-making processes. Here, the PUC was the protagonist in the action, which its Counsel indicates that it undertook for the laudable purpose of informing the Court, and thereby all of the interested parties in the bankruptcy case, of the actions planned by the PUC. This action by the PUC is strongly commended, as it did in fact keep all of the PUC proceedings in front of all interested parties and the Court, where such proceedings could be considered and acted upon as quickly as possible.

Unfortunately for the PUC, in this case we cannot adopt its further suggestions that its findings are "binding" upon the Debtor and this Court, and that therefore our only duty is to blindly enforce the PUC's directives. We do, of course, give great deference to the PUC's findings and conclusions in light of its charge to regulate common carriers in a manner which will protect the public interest and its expertise in doing so. However, in this case, we must consider interests of the Debtor and its creditors which the PUC, perhaps properly for its purposes, did not address. The weight of these interests, as well as the weight of interests of the public, which is dependent upon taxi-cab service, combined with the fact that at least the PUC's prosecutorial staff, as of August 25, 1986, was convinced that the Debtor's self-insurance program would adequately protect the public, causes us, in this case, to take the admittedly serious step of enjoining the PUC's directives.

Since the PUC itself originally and very properly invoked our jurisdiction in this matter, it could scarcely contest it. However, since the issues of jurisdiction must concern us, as a federal court of limited jurisdiction, despite the failure of the parties to raise the issue, we note that, in every Court of Appeals decision which we have found construing either the present Bankruptcy Code or the predecessor Bankruptcy Act, jurisdiction to consider whether a bankruptcy court may grant relief to a debtor from federal or state administrative agency directives has been held to lie. *See, e.g., In re National Hospital & Institutional Builders*, 658 F.2d 39, 43–44 (2d Cir.1981); *Missouri v. U.S. Bankruptcy Court*, 647 F.2d 768, 774–75 (8th Cir.1981); *Securities & Exchange Commission v. First Financial Group*, 645 F.2d 429, 440 (5th Cir.1981); *In re Shippers Interstate Serv., Inc.*, 618 F.2d 9, 13 (7th Cir.1980); and *In re Bel Air Chateau Hospital*, 611 F.2d 1248, 1250–52 (9th Cir.1979).

Turning to the merits, we begin by noting that the PUC contends that its actions to direct the Debtor to cease and desist from its operations as a common carrier are not within the scope of the automatic stay imposed by 11 U.S.C. § 362(a) as a result of 11 U.S.C. § 362(b)(4), which provides as follows:

(b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)), does not operate as a stay— ...

(4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power; ...

We observe that § 362(a) has been found to apply, irrespective of § 362(b)(4), even when a governmental body issues a regulatory order, if the state regulatory action "directly conflict[s] with control of the *res* or property by the bankruptcy court," *Missouri supra*, 647 F.2d at 776, or if the regulatory action involves protection of pecuniary interests of the state. *In re Rath Packing Co.*, 35 B.R. 615, 621–22 (Bankr.N.D.Iowa 1983); and *In re Mason*, 18 B.R. 817, 822 (Bankr.W.D.Tenn.1982). While we are not prepared to say that the automatic stay does not apply here, under the authority of these cases, we believe that the PUC's Complaint, while not drafted in those terms, effectively constitutes a request to the Court for relief from the

stay. Therefore, we clearly do not conclude that 11 U.S.C. § 362(a) protects the Debtor from the relief sought by the PUC hereinafter.

■ However, as the Debtor suggests, it is quite clear that, even where an automatic stay, per 11 U.S.C. § 362(a), is not in place, a bankruptcy court may, in its discretion, grant a stay pursuant to 11 U.S.C. § 105(a), which provides as follows:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

The broad powers granted by this section have frequently been held to authorize a bankruptcy court to issue a "non-automatic stay" order where a stay was held to be outside of the scope of 11 U.S.C. § 362(a). *See, e.g., Securities & Exchange Commission v. First Financial Group, supra,* 645 F.2d at 440; *In re Thomassen,* 15 B.R. 907, 910 (9th Cir.Bankr.App.Panel 1981); *In re Wengert Transp. Co.,* 59 B.R. 226, 231 (Bankr.N.D.Iowa 1986); *In re Professional Sales Corp.,* 48 B.R. 651, 657–58 (Bankr.N. D.Ill.1985); *In re Kawano,* 27 B.R. 855, 856 (Bankr.S.D.Cal.1983); and *In re Vantage Petroleum Corp.,* 25 B.R. 471, 475–76 (Bankr.E.D.N.Y.1982).

The issues before the Court therefore boil down to the following: (1) What are the standards to be applied in determining whether 11 U.S.C. § 105(a) may properly be invoked to enjoin governmental regulatory action?; and (2) Have those standards been met by the Debtor here?

The cases decided both under § 105(a) or under similar Rules in place per the previous Bankruptcy Act are uniform in reciting, at least in general terms, the applicable standard for invocation of the remedy of a bankruptcy stay to halt a governmental regulatory order: "To the extent that the exercise of a [governmental proceeding] threatens the assets of the debtor's estate, the bankruptcy court may issue a

stay of those proceedings." *Securities & Exchange Commission v. First Financial Group, supra,* 645 F.2d at 440. *See, also, e.g., Shippers Interstate, supra,* 618 F.2d at 13; *Bel Air Chateau, supra,* 611 F.2d at 1251; *Vantage Petroleum, supra,* 25 B.R. at 476; *In re Tucson Yellow Cab Co.,* 21 B.R. 166, 168 (Bankr.D.Ariz.1982); and *Mason, supra,* 18 B.R. at 822.

■ The application of this standard to the Findings of Fact made here results in a clear conclusion. The assets of the Debtor's estate are, as is indicated in particularly Finding of Fact 18 *supra,* not only threatened, but almost assuredly will be lost if the relief sought by the Debtor is not granted. Unless relief is granted, as of October 1, 1986, the Debtor will be forced to go out of business, the only alternatives being the unlikely possibilities that Balboa will reconsider its decision to cease insuring the Debtor's taxi-cabs, another insurer will be found, or some new proposal acceptable to the PUC will be discovered.

The fact that the Debtor would be ruined as a going business should, in itself, be sufficient to merit serious consideration to granting the relief sought here. However, there is more. If the Debtor is liquidated, a buyer must be found for its primary asset, i.e., its eight hundred (800) PUC certificates. Recently, in another case involving the sale of thirty (30) such certificates, the court was impressed with the testimony of former PUC Commissioner Louis Carter regarding the uncertainty that a market exists—and statistics indicating that only thirty (30) such certificates have been marketed in the past year.[1]

As in the case of most business operations that are compelled to liquidate, there would be severe financial losses to creditors and human suffering caused by employment displacement here. But, again there is more. It cannot be forgotten that the loss of approximately half of the present taxi-cab service now available to the citizens of Philadelphia and the visitors

---

1. Testimony of September 18, 1986, in *In re Penn Radio Cab, Inc.,* Case No. 82–03036K

(Bankr.E.D.Pa.).

to the City will negatively impact on the entire business community as well as the quality of life of our citizens. At the very least, taxi-cab service presents an alternative to a public transportation system the rates of which have continuously spiraled upward and which threatens to discontinue a significant portion of its services. The disappearance of this transportation alternative therefore must be avoided unless no practical alternative exists.

It is against these threats to not only the Debtor's estate, but also to the quality of life in our City, that the risk to the public in allowing the Debtor to self-insure must be weighed. Certainly, we recognize the PUC's legitimate concern about the Debtor's ability to compensate customers and third parties whom its drivers negligently injure or whose property they damage in inevitable vehicular accidents. However, if the Debtor is forced out of business, among the creditors victimized may be entities having claims arising from damages from accidents in the past.

Our reluctance to reach a conclusion different from that of the PUC is tempered somewhat by the inconsistent responses of the PUC itself to the Debtor's self-insurance plan. On August 25, 1986, the PUC's prosecutorial counsel stipulated that the terms of the Settlement Agreement, which requires numerous changes in the Debtor's operations and provides a means to terminate the Debtor's operations if it cannot meet the Agreement's financial requirements, "provides adequate protection to the public." The Settlement Agreement certainly appeared to put only the financial capacity of the Debtor to meet the terms of the Settlement Agreement before the Commission.

Nevertheless, ALJ Smolens appears to decide against acceptance of the Debtor's plan *solely* because *he* did not believe that the plan provides the very protection which the staff stipulated that it did. Likewise, in her Motion, adopted by the PUC on September 23, 1986, Chairman Taliaferro criticizes the capacity of the proposed plan to protect the travelling public, which,

again, is contrary to her staff's stipulation. Although she alternatively questions the ability of the Debtor to fund the plan, she makes no specific findings on this score. Furthermore, ALJ Smolens made no specific findings on this issue either, even though this was ostensibly the only issue before him. We must remark that Robert Seaner, the Debtor's Vice-President, testified before us, and his presence and candor tended to support the credibility of his projections that the Debtor *could* fulfill the plan's financial requirements.

We must emphasize that our decision is not and could not, in a matter of such public importance, be made solely or even partially on the ground that the PUC made procedural errors or has not been consistent in its handling of this matter. The purpose for giving prominence to this history of the administrative proceedings is simply to observe that the PUC prosecutorial staff stipulated that the Debtor's Plan was adequate to protect the riding public. It was principally on this ground alone that ALJ Smolen and Chairman Taliaferro rejected the Debtor's application. These differences in opinion as to the feasibility of the Debtor's Plan, even among the PUC staff, convinces us that the protections envisioned, at least under the full terms of the Settlement Agreement, may well be adequate. As the Debtor has agreed, and we certainly would insist upon even had it not done so, our relief to the Debtor is conditioned upon its full and faithful compliance with all of the terms of the Settlement Agreement.

We therefore conclude that the instant factual situation constitutes an extraordinary set of circumstances such that it is appropriate for this Court to invoke 11 U.S.C. § 105(a) and enjoin enforcement of the PUC Order. We find the most direct support for our decision is in *Rath, supra,* where the bankruptcy court enjoined a State Insurance Commissioner from revoking a self-insurance exemption of a packing company after the company had filed bankruptcy. Here, we believe that the presence of many factors favorable to the Debtor's

position absent in *Rath* commands a similar result.

The foregoing disposition, solely on the basis of 11 U.S.C. § 105(a), makes it unnecessary for us to decide the case upon the Debtor's alternative ground for relief, i.e., that the PUC's actions constituted unlawful discrimination against it due to its having filed bankruptcy, as is prohibited by 11 U.S.C. § 525(a), which states as follows:

> (a) Except as provided in the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. §§ 499a–499s), the Packers and Stockyards Act, 1921 (7 U.S.C. §§ 181–229), and section 1 of the Act entitled "An Act making appropriations for the Department of Agriculture for the fiscal years ending June 30, 1944, and for other purposes," approved July 12, 1943 (57 Stat. 422; 7 U.S.C. § 204), a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

■ We do note that, if discrimination as proscribed by 11 U.S.C. § 525(a) were found, that, in itself, would justify invocation of 11 U.S.C. § 105(a), without even a showing that the Debtor's assets were threatened, as such discrimination cannot be countenanced in any circumstances. *See Smith v. Pennsylvania Department of Transportation*, 66 B.R. 244 (E.D.Pa., 1986), *rev'g*, 58 B.R. 78 (Bankr.E.D.Pa. 1986); *Henry v. Heyison*, 4 B.R. 437 (E.D.Pa.1980); *In re Jacobsmeyer*, 13 B.R. 298 (Bankr.W.D.Mo.1981); and *In re Maley*, 9 B.R. 832 (Bankr.W.D.N.Y.1981).

■ We should note that, if it were necessary to decide this issue, we would be inclined to give a broad reading to 11 U.S.C. § 525(a). While we acknowledge the presence of language in § 525(a) reciting that only governmental action taken "solely because" of a bankruptcy filing is prohibited, we do not think that a debtor need prove that the government explicitly denied a benefit only because of a bankruptcy filing to prove a case under § 525(a). It would be quite impossible—or at least unlikely—that a governmental unit could be found to have acted adversely on the grounds of a debtor's bankruptcy filing rather than at least partially upon consideration of the financial circumstances of the debtor which led to the bankruptcy filing. It is also unlikely that a governmental body cognizant of § 525(a) will concede that it acted exclusively on the basis of a bankruptcy filing. Therefore, we believe that adverse governmental actions concerning which a bankruptcy filing appears to have played a significant role are proscribed by § 525(a).

■ We further believe that the burden of proof in a discrimination charge under 11 U.S.C. § 525(a) should be approached precisely as in a charge of discrimination in employment, housing, or public accommodations due to race, color, religion, sex, or national origin. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Hence, if an entity or person is found to be or have been a debtor and to have been denied a governmental benefit for which he was qualified, he should be found to have made out a prima facie case for relief under § 525(a), requiring the governmental unit taking the adverse action to articulate

a legitimate, nondiscriminating reason for its adverse actions in order to prevail.

However, making a § 525(a) analysis on the facts in this record is not necessary here due to our finding that the Debtor is entitled to the relief sought in its counter-claim without resort to 11 U.S.C. § 525(a). We therefore do not reach the issue of whether the Debtor might also be entitled to relief on the basis of 11 U.S.C. § 525(a).

We do note that we consider the Order issued this day to be a final resolution of this Complaint, rather than a preliminary injunction, as was suggested we do by Counsel for the Creditors' Committee at oral argument. We also urge that the Debtor not refrain from its articulated intentions to appeal the PUC's Order in state court, in order that any conflict between the Orders of this Court and the directives of the state may be avoided.

We also end as we began, by commending the professional manner in which the PUC proceeded in this Court and trust that the result here will not effect any change in that respect in the future, if for no other reason than to assure that the PUC will work with us in monitoring the Debtor's compliance with the terms of the Settlement Agreement. With that assurance, we feel confident that our Order will best serve the public interest.

APPENDIX A
BEFORE THE PENNSYLVANIA PUBLIC
UTILITY COMMISSION

IN THE MATTER OF THE REQUEST OF METRO TRANSPORTATION COMPANY, T/A YELLOW CAB COMPANY, FOR APPROVAL OF SELF–INSURANCE STATUS

NO. A–00103281

*SETTLEMENT AGREEMENT*

A petition has been filed by Metro Transportation Company, t/a Yellow Cab Company (Metro), pursuant to Section 512 of the Public Utility Code, 66 Pa.C.S § 512, and the regulations at 52 Pa.Code § 29.104(d), requesting approval from the Public Utility Commission (PUC) to act as a self-insurer as to claims for bodily injury, medical expense, lost wages and property damage claims arising out of incidents and events occurring after 12:01 a.m., October 1, 1986, and before 12:01 a.m., October 1, 1987, in accordance with procedures described herein.

The attached stipulations and any other stipulations entered into and referring to this agreement, are to become part of the record of this proceeding.

Based upon the foregoing, the parties have agreed, pursuant to extensive negotiations, that the plan of self-insurance described in this agreement provides adequate protection to the public, subject to submission by Metro of adequate evidence of its financial capacity to fund the plan on an ongoing basis during the term thereof; that is, if the Administrative Law Judge and the PUC find that Metro has put forth adequate evidence of its financial capacity to fund the plan on an ongoing basis, it is recommended that an initial decision be issued incorporating and adopting the terms of this settlement agreement, and that a final PUC order be entered adopting the initial decision, subject to the satisfaction of the conditions precedent, as described herein.

SELF–INSURANCE PROCEDURES

A. DEFINITIONS

As used in this agreement—

1. "METRO" means the petitioner, Metro Transportation Co., t/a Yellow Cab Company, as: (a) a debtor-in-possession in Bankruptcy Number 86–036180, subject to the jurisdiction of the United States Bankruptcy Court for the Eastern District of Pennsylvania; (b) in the future, as a discharged and reorganized debtor under a plan of reorganization duly adopted, approved and implemented by the Bankruptcy Court; and (c) and its successors and assigns, to the extent of the obligations imposed hereunder.

2. "Third-Party Administrator" (hereafter, "TPA") means a person or entity selected by Metro, and approved by the staff

of the PUC, which approval will not be unreasonably withheld, which is to enter into a contract with Metro to investigate, adjust, litigate and, when appropriate in the judgment of the TPA, settle Claims as herein defined, upon such terms and conditions as established by this order and the contract.

3. "Claims" means tort, no-fault, and uninsured motorist claims for bodily injury, wage loss, medical expense and property damage made or brought against Metro and/or its employees and drivers covered by this agreement arising out of incidents or events occurring after 12:01 a.m., October 1, 1986, and before 12:01 a.m., October 1, 1987.

4. "Bank" means the bank at which Escrow Depository Funds will be established out of which Claims will be paid and such fees due the TPA and others for the investigation, adjustment and litigation of claims and the payment of claims will be made.

5. "Drivers" means the drivers of all cabs covered by these self-insurance procedures, including Metro's employees, lessee-drivers, independent owners, and installment purchasers of cabs.

6. "Claims Fund" means the Escrow Depository Fund established at the Bank out of which payment for claims will be made.

7. "Expense Fund" means the Escrow Depository Fund established at the Bank out of which all fees and expenses for the payment of the TPA will be made, including allocated expenses.

8. "Weekly Deposit" means the delivery of a check or checks, in an amount(s) established herein, by Metro to the Bank, or a wire transfer(s) to the Bank, for the purpose of adding to the funds created hereunder.

## B. INITIAL AND WEEKLY DEPOSITS

1. On or before October 1, 1986, or, in any event, before Metro operates as a self-insurer, Metro shall make an initial deposit of $133,000 to the Claims Fund, followed by weekly deposits into the Claims Fund of $54,000 to be made by the delivery of a check(s) or wire transfer(s). The first weekly deposit of $54,000 shall be made on Monday, October 6, 1986, and weekly deposits shall continue to be made on each successive Monday, unless a Monday is a bank holiday, in which event the weekly deposit is to be made on the next business day, the last of which payments to be made on October 1, 1987. Appropriate evidence of the weekly deposits shall be delivered promptly to the staff of the PUC.

2. On or before October 1, 1986, Metro shall make an initial deposit of 30,000 into the Expense Fund, followed by weekly deposits into the Expense Fund of $9,000. The initial weekly deposit of $9,000 shall be made on Monday, October 6, 1986, and weekly deposits of $9,000 shall continue to be made on each successive Monday in accordance with preceding paragraph.

3. At all times at least $100,000 shall be maintained in the Claims Fund unless a lower amount is approved by the PUC. In the event that the Claims Fund contains less than $100,000, Metro's weekly deposit to the Claims Fund shall increase to $66,000 per week until the Claims Fund does contain at least $100,000. If the PUC determines that a weekly deposit of $66,000 to the Claims Fund is insufficient to replenish the Claims Fund within an appropriate period of time, it may act in accordance with paragraph G-1 hereof.

## C. CREATION AND ADMINISTRATION OF THE FUNDS BY BANK

1. The terms and conditions of the Bank's participation as Fund Agent and its duties as such shall be established through an instrument which shall provide as follows:

(a) All funds in the Claims Funds shall be held solely for the benefit of claimants for personal injury, medical expenses, lost wages and property damage. All funds in the Expense Fund shall be held solely for the purpose of paying all fees and expenses of or for the TPA, including allocated ex-

penses. Neither fund shall be subject to attachment or diversion to the benefit of any person, entity, corporation, governmental body, taxing authority, or to the benefit of other creditors or potential creditors of Metro, except as provided herein.

(b) Under no circumstances, except in accordance with these procedures and the order adopting this agreement, shall Metro have access to or control over the contents or disposition of the funds.

(c) The bank shall invest and reinvest the funds, without distinction between principal and income, in interest-bearing securities and accounts, including obligations of the United States Government and interest-bearing deposit accounts. The Bank shall not be required to pay interest on cash temporarily in its hands pending the investment; provided, however, that any cash which is held in excess of thirty days pending investments shall earn interest at the normal bank rate of interest for such account. Any interest earned shall be treated as part of the principal for all purposes.

(d) Upon presentation to the bank of a written direction by the TPA, executed by an appropriate employee of the TPA, such written direction to be in form and substance satisfactory to the bank, to the effect that a payment of a specific amount of money is to be made on account of a Claim, or that such payment is to be made to or on behalf of the TPA for its fees and expenses, the Bank, out of the appropriate funds shall make payment to the claimant or the TPA or other appropriate party.

(e) The bank shall be paid from the principal of each fund for fees and expenses allocated to that fund.

(f) The Bank shall deliver to Metro, the TPA, and to the PUC on a monthly basis a written statement setting forth all transactions as to the funds, consisting of all contributions to and withdrawals from the funds.

D. ADMINISTRATION OF CLAIMS

1. All taxi cabs covered by this agreement shall prominently display in charac-ters not less than one inch in height and one-quarter inch in width the following: "For Claims of Injury or Damage Contact [the telephone number of the TPA, including area code]." Metro's employees and drivers are required to provide the name and telephone number of the TPA as the appropriate contact for the purpose of making a claim to all members of the public, and to all investigating law enforcement officers, upon request.

Metro is permitted to perform an initial investigation of any accident but is, in any event, required to deliver copies of all accident reports and items of evidence to the TPA within three business days of an accident reported to Metro.

2. The TPA shall perform the investigation, adjustment, litigation, and, when appropriate in the judgment of the TPA, the settlement of all claims. When the TPA determines that a claim should be settled and paid out of the Claims Fund or that a fee or expense should be paid out of the Expense Fund, the TPA shall notify the Bank, in writing, of its determination, and shall thereby direct the Bank to issue a check drawn on the appropriate fund to the claimant or the claimant's counsel, the TPA, or other appropriate party. Metro shall contemporaneously be given a copy of such written direction.

3. In no event may the TPA authorize payments out of the Claims Fund in an aggregate amount in excess of $500,000 for claims arising out a single occurrence. Nothing in this order shall be deemed to limit the rights of any claimant against Metro.

4. Metro shall enter into a contract with a TPA which shall incorporate the Fair Claims Practices Act which, together with otherwise applicable investigative and settlement standards of care, fairness and thoroughness, shall constitute the procedures to be followed by the TPA. These procedures shall include a definition of the TPA's allocated expenses intended to be charged to the Expense Fund and the maintenance of a computerized claims activity reporting system the reports of which shall

be made available to Metro and the PUC upon request. The TPA shall make all files and other documentation available on request to Metro or the staff of the PUC for audit. Based upon such audit either the staff of the PUC or Metro may petition the PUC for an amendment to these procedures.

### E. TERMS OF FUNDS

1. Separate funds shall be established for each year for the purpose of paying claims and fees and expenses arising out of incidents or occurrences from October 1, 1986 to October 1, 1987. Upon written request of Metro and upon a final order of the PUC certifying that all claims reasonably likely to be successfully made, and/or all TPA fees and expenses likely to be due, arising out of accidents occurring during the year, October 1, 1986 to October 1, 1987, have been made and settled, or are otherwise adequately provided for by the establishment of other security, or otherwise, the Bank shall return the remaining funds to Metro. A return of any funds to Metro does not alter its obligation under applicable law to pay claims, fees and expenses arising out of incidents or occurrences from October 1, 1986 to October 1, 1987.

2. If, on October 1, 1987, insufficient funds are present to pay claims, fees and expenses arising out of incidents or occurrences from October 1, 1986 to October 1, 1987, Metro will use its best efforts to arrange for the deposit(s) of additional funds or otherwise adequately provide for payment of such claims, fees and expenses by the establishment of other security, subject to appropriate orders of the bankruptcy court.

### F. SAFETY PROGRAM

1. Metro will implement a safety and driver education program which includes the following elements:

(a) all drivers shall be required to report all accidents to Metro within 24 hours of occurrence.

(b) license checks for all applicants before they begin to drive cabs.

(c) the use of a complaint control center to be established by Metro for the purpose of tracking consumer complaints and bringing those complaints to the attention of the drivers.

(d) requiring all drivers to take part in a nationally certified defensive driving course.

2. Nothing herein shall be deemed to replace Chapter 29 of Title 52, Pennsylvania Code, constituting the "Motor Carriers of Passengers."

### G. RESCISSION OF APPROVAL

1. Upon receipt by the PUC of evidence of a breach of this agreement by Metro, it will enter an order against Metro to show cause why Metro's self-insurer status should not be rescinded. Metro will have 5 days to respond to the order to show cause, after which it will be afforded an opportunity for an expedited hearing before an Administrative Law Judge ("ALJ") of the PUC. After such hearing, the ALJ will certify the record to the Commission for entry of an appropriate order.

2. Upon receipt by the PUC of information, other than information showing a breach as set forth in the preceding paragraph, indicating that the public interest demands rescission of approval of self-insurer status, the PUC will institute a Complaint against Metro alleging the specific facts known by the staff of the PUC at the time of issuance, and affording Metro twenty days to answer the Complaint, after which a hearing before an ALJ of the PUC will be scheduled.

### H. REVIEW PROCEDURES FOR ADEQUACY OF WEEKLY DEPOSIT AND FARE RATE

1. The Bank and the TPA will each deliver quarterly written reports to the PUC and Metro, consisting of a financial statement and an analysis of the disbursements and weekly deposits of the funds, including all payments to the TPA and the TPA's

allocated expenses, and an analysis of the expected claims to be made against Metro during the term of the funds. On the basis of these reports, and on the basis of any other documents and evidence submitted by any interested party, the plan and the underlying fare rates shall be analyzed by the staff of the PUC and Metro for adequacy.

2. Either the staff of the PUC or Metro, at any time, may seek an adjustment in the weekly deposits, the fare rate charged, or in any other component or aspect of these procedures, or the TPA's or Metro's operation hereunder, through the filing of an appropriate written pleading. Metro and the PUC will agree to the expedited presentation of the matter to a PUC Administrative Law Judge.

3. Nothing in these procedures, this agreement or the order adopting this agreement shall preclude Metro and/or the staff of PUC from seeking review of the adequacy of the weekly deposits or the fare rate or any other matter, in accordance with the Public Utility Code and the regulations thereunder.

### I. UMBRELLA OR EXCESS COVERAGE

On a quarterly basis, Metro will seek, at affordable rates, coverages for claim losses in excess or $500,000.

### J. SETTLEMENTS IN EXCESS OF FUND

When it is agreed by Metro and the TPA that it is in the best interests of the Fund and Metro to settle a claim in excess of the contents of the Fund, Metro will use its best efforts to obtain from whatever source is available additional funds to pay the claim, and to receive appropriate authorization from the Bankruptcy Court to do so.

CONDITIONS PRECEDENT

The PUC order approving Metro's operation as a self-insurer shall be in force only upon the occurrence of the following events:

1. The entry of a valid order of the PUC authorizing Metro to increase its flag drop from $1.25 to $1.50 and authorizing Metro to increase the tariff for its shared ride program in accordance with and to the extent of Metro's presently pending request for a rate increase.

2. The entry of an order of the United States Bankruptcy Court authorizing the expenditure and use of funds required under these procedures as a valid ongoing cost of administration of the bankrupt estate.

· 3. The entry of a final order of the PUC adopting and incorporating the terms of this settlement agreement.

CONCLUSION

The parties, having agreed to the foregoing, and subject to the determination of Metro's financial capacity, recommend that the Administrative Law Judge issue an initial decision which adopts and incorporates the terms of this agreement. The parties agree that any exceptions to the initial decision of the ALJ shall be filed within five days.