### In re DELAWARE RIVER STEVEDORES, INC., Debtor.

Bankrtupcy No. 91–13673S.

United States Bankruptcy Court, E.D. Pennsylvania.

July 16, 1991.

Nathalie Martin, John F. Gough, Hoyle, Morris & Kerr, Philadelphia, Pa., for debtors.

Stanley B. Gruber, Freedman & Lorry, P.C., Philadelphia, Pa., for employees.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

C.S. Donoghue, Jr., Dept. of Labor, Office of Workers Compensation Programs,

---

Div. of Longshore & Harbor Workers, Washington, D.C., for Dept. of Labor.

Eric E. Scheck, Meyner and Landis, Newark, N.J., for Nat. Westminster Bank.

## OPINION

DAVID A. SCHOLL, Bankrutpcy Judge.

## A. INTRODUCTION

The instant contested matter requires us to consider whether the automatic stay or a stay issued pursuant to 11 U.S.C. § 105(a) should be issued to prevent the United States Department of Labor ("the DOL") from demanding payment on a letter of credit ("L/C") issued by the Debtor's secured lender, National Westminster Bank N.J. ("Westminster"). The L/C in issue was given by the Debtor as security for the Debtor's participation as a self-insurer in the DOL's Workmen's Compensation Program ("the Program"), and the DOL demands payment because the Debtor failed to continue to make payments due on its obligations under the Program post-petition.

We hold that the automatic stay arising from 11 U.S.C. § 362(a) does not apply to the DOL's attempt to draw upon the L/C. We further conclude that we are not inclined to permanently stay the DOL's actions under § 105(a) unless and until we are certain that the Debtor cannot continue making the payments regularly due under the Program, thus eliminating the DOL's expressed ground for drawing on the L/C. We therefore will grant only a temporary stay of the DOL's draw on the L/C, conditioning a further stay on the Debtor's making an effort to obtain permission to continue making the Program payments itself.

## B. PROCEDURAL AND FACTUAL HISTORY

DELAWARE RIVER STEVEDORES, INC. ("the Debtor") filed the voluntary Chapter 11 case giving rise to this controversy on July 2, 1991. In the afternoon of Wednesday, July 3, 1991, after a colloquy with counsel for the Debtor, Westminster, the DOL, and the United States Trustee's office, we approved the temporary utiliza-

tion of an "Interim Financing Agreement" between Westminster and the Debtor until the date of a final hearing on August 1, 1991.

In the course of that hearing, the Debtor produced the matter before us, designated as an "Emergency Motion for Order Specifically Enjoining United States Department of Labor from Declaring Ipso Facto Default And Seizing Collateral In Violation of the Automatic Stay" ("the Motion"). While we declined the Debtor's request that an Order granting it provisional relief as requested in the Motion be entered immediately, we scheduled a hearing on the Motion at 1:00 P.M. on Monday, July 8, 1991. By agreement of interested counsel appearing on July 8, 1991, which now also included an attorney representing a labor union and numerous union employees of the Debtor, some of whom were recipients of payments under the Program, we continued the hearing until 11:00 A.M. on July 11, 1991.

The sole witness at the hearing was Robert Palaime, the Debtor's chief executive officer. Palaime produced a copy of the L/C, dated December 21, 1988, in the amount of $900,000, and an amendment thereto of May 5, 1989, increasing the amount of the L/C to $1.4 million. The L/C states, in pertinent part, that Westminster, its issuer,

> undertake[s] to promptly honor [the DOL's] sight drafts ... accompanied by [the DOL's] statement ... either that: "The amount drawn represents the amount by which [the Debtor] has failed to pay its workers' compensation obligations, under the Longshoremen's and Harbor Workers' Compensation Act (the "Longshore Act"), for and on account of injury or death occurring to their employees on or after January 1, 1988 to the expiration date of the Letter of Credit or stating that [the Debtor] filed for bankruptcy," ...

Palaime stated that the Debtor was presently obliged to pay a premium equal to one (1%) percent per year on the L/C, or $14,000 annually, to Westminster for the maintenance of the L/C. However, pursu-

ant to its agreements with Westminster, the Debtor would be obliged to repay Westminster at a rate of 11¼ percent, or $157,000 annually, to pay back the sum reflected by any draw on the L/C by the DOL. This increased financial obligation was forecast by Palaime as being possibly fatal to the Debtor's reorganization efforts, as the increment amounted to about forty (40%) percent of the Debtor's current trade debt of about $400,000.

Palaime further stated that the Debtor had been current on Program payments through the date of its bankruptcy filing. He (or, more accurately, the Debtor's counsel) indicated that the automatic stay compelled the Debtor's discontinuance of payments under the Program after its bankruptcy filing. Palaime and the Debtor's counsel expressed a willingness to allow the DOL to draw on the L/C, but only as to the amount of unpaid payments under the Program, stating that, although Westminster would undoubtedly impose interest on those draws, it would be less devastating to the Debtor's reorganizational efforts and its crucial lender-borrower relationship with Westminster than the threatened immediate $1.4 million lump-sum draw on the L/C by the DOL. Finally, Palaime emphasized the magnitude and significance of the Debtor's obligations under the Program, estimated at $1.9 million in 1990, as a factor resulting in the bankruptcy filing.

The union attorney, in cross-examination, brought out the fact that, prior to the filing, the Debtor had been making payments under the Program arising from obligations of its predecessors, Delaware Operating Co. ("DOC") and I.T.O. Corp. ("ITO"), as well as itself. When the Debtor stopped making payments, it ceased payments on the obligations of DOC and ITO as well. The employees' counsel implied that the solvent owners of DOC and ITO were utilizing the Debtor's bankruptcy as a shield to avoid payment of obligations under the Program which they were financially capable of making.

The DOL's counsel represented that the sole triggering event for the DOL's demand under the L/C was the Debtor's fail-

ure to continue to make Program payments. Counsel expressly assured us that the DOL would not draw on the L/C solely because the Debtor filed bankruptcy, even though the L/C, on its face, gave the DOL that right. In light of the Debtor's non-payment, however, the DOL was unwilling to agree to any delay in making a request that Westminster pay on the L/C, even until this court received further briefing from the parties on Monday, July 15, 1991. However, counsel for both the DOL and Westminster indicated that the demand for payment had not yet been honored.

In light of the foregoing, this court entered an Order of July 11, 1991, by which the DOL was stayed from demanding and accepting payment on the L/C, and Westminster was stayed from paying on the L/C, until 12:00 Noon on July 18, 1991, unless we issued an intervening order of this court lifting or extending the stay, while interested parties were given the opportunity to file briefs in support of their respective positions in reference to the Motion on or before 4:30 P.M. on July 15, 1991.

## C.  DISCUSSION

1. THE LETTER OF CREDIT IS NOT PROPERTY OF THE DEBTOR'S ESTATE; THEREFORE, THE AUTOMATIC STAY DOES NOT APPLY TO IT.

■ The great weight of authority rejects the Debtor's initial contention that the L/C, held by Westminster for the benefit of the DOL (and ultimately the injured employees under the Program) is property of the Debtor's estate under 11 U.S.C. § 541(c), the removal of which from its estate violates 11 U.S.C. § 362(a). *See In re Air Conditioning, Inc. of Stuart*, 845 F.2d 293, 296 (11th Cir.), *cert. denied sub nom. First Interstate Credit Alliance, Inc. v. American Bank*, 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988); *In re Compton Corp.*, 831 F.2d 586, 589 (5th Cir.1987); *Lower Brule Construction Co. v. Scheesley's Plumbing & Heating Co.*, 84 B.R. 638, 644 (D.S.D.1988); *In re Page*, 18 B.R. 713, 715–16 (D.D.C.1982); *In re Metro*

*Communications, Inc.,* 115 B.R. 849, 853–54 (Bankr.W.D.Pa.1990); *In re Zenith Laboratories, Inc.,* 104 B.R. 667, 671 (Bankr. D.M.J.1989); *In re San Jacinto Glass Industries, Inc.,* 93 B.R. 934, 937 (Bankr. S.D.Tex.1988); *In re Guy C. Long, Inc.,* 74 B.R. 939, 942–44 (Bankr.E.D.Pa.1987) (FOX, J.); and *In re McLean Trucking Co.,* 74 B.R. 820, 823–29 (Bankr. W.D.N.C.1987).

In support of its position that §§ 362(a) and 541(c) *do* apply, the Debtor cites *In re Prime Motor Inns, Inc.,* 123 B.R. 104, 111 (Bankr.S.D.Fla.1990); *In re Air Conditioning, Inc. of Stuart,* 55 B.R. 157 (Bankr. S.D.Fla.1985), *aff'd in part & rev'd in part,* 72 B.R. 657 (S.D.Fla.1987), *aff'd in part & rev'd in part,* 845 F.2d 293, *supra;* and *In re Twist Cap, Inc.,* 1 B.R. 284, 286 (Bankr.M.D.Fla.1979). However, the *Stuart* decision was reversed on this very point by both the district court and the Court of Appeals. *See* 845 F.2d at 295–97. The result of *Twist Cap* has, in the words of the *Compton* court, 831 F.2d at 589–90, "been roundly criticized and otherwise ignored by courts and commentators alike." Even Bankruptcy Judge Paskay, the author of *Twist Cap,* indicated a reluctance to follow its holding in the face of the severe criticism of its result in *In re St. Petersburg Hotel Associates, Ltd.,* 37 B.R. 380, 382–83 (Bankr.M.D.Fla.1984).

The *Prime Motor* Opinion, while preliminarily enjoining a draw on a L/C, fails to directly address the issue of whether the L/C is property of the debtor's estate. Rather, the court addresses principally the issue of whether the beneficiary of the L/C can draw upon the L/C when the debtor's only default arises from an *ipso facto* clause designating a bankruptcy filing as a default which allows the L/C to be drawn upon. 123 B.R. at 108–10. Although the Debtor argues that the DOL is acting on the basis of an *ipso facto* clause here, we find that the DOL defused this issue by expressly stating that it was *not* the Debtor's bankruptcy filing, but rather its failure to make the requisite payments under the Program, which was the sole reason for its demand of payment of the L/C from Westminster.

We therefore refuse to conclude that the DOL's draw on the L/C from Westminster would be violative of 11 U.S.C. § 362(a). Of course, even if § 362(a) were applicable, the DOL and possibly the union attorney would be unlikely to hesitate in seeking relief from the stay to proceed against the L/C. The Debtor's lack of direct interest in the payment of the L/C would quite possibly result in the prompt granting of relief from the stay to permit the payment.

2. THE DEBTOR MUST EXHAUST EFFORTS TO CONTINUE MAKING THE PROGRAM PAYMENTS DIRECTLY BEFORE WE COULD POSSIBLY CONCLUDE THAT IT MEETS THE CRITERIA FOR A STAY OF THE DOL'S DRAW ON THE LETTER OF CREDIT; THEREFORE, THE DOL'S ACTION IS STAYED ONLY PENDING THE PRESENTATION OF A MOTION OF THE DEBTOR TO CONTINUE MAKING THE PROGRAM PAYMENTS DIRECTLY.

■ The Debtor has alternatively argued that it is entitled to relief against the DOL's draw on the L/C under 11 U.S.C. § 105(a). While we have decried the invocation of § 105(a) as a basis

"for our proceeding to take otherwise doubtfully authorized judicial actions," *In re Telephonics, Inc.,* 85 B.R. 312, 318 (Bankr.E.D.Pa.1988), or " 'as a loose cannon ... to support otherwise unsupportable claims,' " *In re University Medical Center,* 82 B.R. 754, 758 (Bankr.E.D.Pa. 1988) (quoting *In re Latimer,* 82 B.R. 354, 364 (Bankr.E.D.Pa.1988)),

*In re Amatex Corp.,* 97 B.R. 220, 225 (Bankr.E.D.Pa.), *aff'd sub nom. Amatex Corp. v. Stonewall Insurance Co.,* 102 B.R. 411 (E.D.Pa.1989), we have indicated that it *is* often appropriate to invoke "the use of § 105(a) as a shield, to extend the application of the bankruptcy stay slightly beyond the confines of § 362(a)." *Id. See, e.g., MacArthur Co. v. Johns–Manville Corp.,* 837 F.2d 89, 93–94 (2d Cir.), *cert. denied,* 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988); *A.H. Robins Co. v.*

*Piccinin,* 788 F.2d 994, 1003 (4th Cir.), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); *In re Orfa Corp. of Philadelphia, Inc.,* 129 B.R. 404, 422–23 (Bankr.E.D.Pa.1991); *In re University Medical Center,* 82 B.R. 754, 757 (Bankr. E.D.Pa.1988); *In re Monroe Well Service, Inc.,* 67 B.R. 746, 752–53 (Bankr.E.D.Pa. 1986); and *In re Metro Transportation Co.,* 64 B.R. 968, 973–74 (Bankr.E.D.Pa. 1986).

In this vein, Judge Fox of this court, in *Guy C. Long, supra,* stated that an injunction prohibiting the payment on a L/C could conceivably be appropriate if the following factors for issuing § 105(a) injunctions generally weighed in the debtor's favor:

> (1) there must be a danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize; (2) there must be a reasonable likelihood of a successful reorganization; (3) the relative harm between the debtor and the entity which would be restrained must be balanced; and (4) the public interest in successful bankruptcy reorganizations must be balanced against other competing societal interests.

*Accord, Lower Brule, supra,* 84 B.R. at 845. *Cf. Page, supra,* 18 B.R. at 717; *Prime Motor, supra,* 123 B.R. at 108–11; and *McLean Trucking,* 74 B.R. at 829.

Consideration of the first of these four criteria causes us to stop and consider the practicalities of the factual situation before us. The Debtor is willing to allow the DOL to draw on the L/C to the extent that the DOL is obliged to make payments to the employees of the Debtor covered by the Program in lieu of the payments otherwise due from the Debtor. The Debtor would, however, be better off if it paid the employees directly. By making direct payments, the Debtor would avoid the imposition of the 11¼ percent interest increment to the Program payments which would result from the sequence of the Debtor's failing to make the payments, the DOL's making the payments to the employees in its stead, the DOL's charging Westminster for the payments which it makes under the L/C, and Westminster's in turn charging back the Debtor for the payments. The DOL has already stated that, if the Debtor made the Program payments, it would not attempt to draw on the L/C. Westminster would certainly prefer being left out of the process of making the Program payments. The employees entitled to the Program payments would hardly oppose the Debtor's making direct payments, since this resolution would allow them to receive payments directly from the Debtor, rather than around the bureaucratic horn from the Debtor. The direct payment process would justifiably be less costly because it would require the payments to pass through the hands of only two parties, the Debtor and the employees.

When the court suggested this solution, only one party was resistent: the Debtor. The Debtor contended that it could not simply proceed to make payment on allegedly pre-petition obligations to the employees in light of the presence of the automatic stay and its need to adhere to the distribution scheme set forth in the Bankruptcy Code.

In its submission of July 15, 1991, the Debtor clings to this resistent posture, citing several cases for the principal that the future payments to workmen's compensation recipients are unsecured claims which are not entitled to immediate payment. *E.g., In re Webster,* 126 B.R. 4 (Bankr.D. Me.1991); *In re National Bickford Foremost, Inc.,* 116 B.R. 351 (Bankr. D.R.I.1990); *Grantham v. Eastern Marine, Inc.,* 93 B.R. 752 (Bankr.N.D.Fla. 1988); *In re Redford Roofing Co.,* 54 B.R. 254 (Bankr.N.D.Ill.1985); and *In re Columbia Packing Co.,* 34 B.R. 403 (Bankr. D.Mass.1983). There are, however, several factors present which could make Program payments here justifiable.

Firstly, the obligation of the Debtor here is secured by the L/C. There is no discussion of the presence of similar security in any of the foregoing cases. By providing security for the Program payments, the Debtor may have created a special expecta-

tion or interest of the injured employees which might require their payment unless adequate protection of those payments is provided by the Debtor. *Cf. In re Shapiro*, 124 B.R. 974, 982–83 (Bankr.E.D.Pa. 1991); and *In re Ford*, 78 B.R. 729, 736 (Bankr.E.D.Pa.1987). It should be recalled that, because of these rights of the injured employees under the L/C, the Debtor does not resist the DOL's making future Program payments to the employees and charging same against the security (the L/C).

Secondly, the presence of *In re M. Frenville Co.*, 744 F.2d 332, 337 (3d Cir.1984), *cert. denied sub nom. M. Frenville Co. v. Avellino & Bienes*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), as the controlling law of this jurisdiction renders the scope of pre-petition claims a relatively narrow one. Certain periodic payments, such as lease payments or monthly mortgage payments, which are not due until post-petition dates, are generally thought of as post-petition obligations. An argument can therefore be made that post-petition payments due under the Program would be payments for post-petition claims which are not subject to the automatic stay under the controlling law in this jurisdiction. *But see National Bickford, supra*, 116 B.R. at 352; and *Columbia Packing, supra*, 34 B.R. at 404 (workmen's compensation claims arising pre-petition are pre-petition claims).

Thirdly, an argument might be made, as the employees suggested, that payments made under the Program are pursuant to actions or proceedings of the DOL to enforce its governmental regulatory power and are exempt from the scope of the stay by reason of 11 U.S.C. §§ 362(b)(4), (b)(5). *But see In re James*, 112 B.R. 687, 704–06 (Bankr.E.D.Pa.), *aff'd in part & rev'd in part*, 120 B.R. 802 (E.D.Pa.1990) (§§ 362(b)(4), (b)(5) must be construed narrowly except in context of environmental law).

Most significant, however, is the observation that, irrespective of whether the Debtor could properly make the Program payments directly without court approval, the Debtor could clearly file a motion requesting court approval of its right to make the Program payments. None of the authorities cited by the Debtor for the principle that Program payments are unsecured claims hold that the respective debtors are prohibited from continuing to make Program payments or similar payments post-petition if they chose to do so. *See Grantham, supra*, 93 B.R. at 753 (debtor's insurance agent paid $118,298.19 in post-petition benefits before the debtor brought an action seeking to obtain a declaration that Program payments were not administrative expenses). If this court would grant such a motion after notice to interested parties, then surely the Debtor's right to make these payments could not be challenged in this court, irrespective of whether the Debtor's obligations to the injured employees were properly classified as administrative claim or not.

It is conceivable that the Debtor's trade creditors or other unsecured creditors might object to what they would perceive as a "preference" given to the injured employees. However, when it is recalled that the alternative to making the Program payments is the imposition of the same charges, plus interest, falling back onto the Debtor to reimburse Westminster for payment of the L/C given as security for the DOL to make these payments, we question whether there would actually be an inclination of any interested parties to oppose the Debtor's making the Program payments directly to the injured employees.

Of course, it is clearly not within this court's powers or prerogatives to make a *sua sponte* motion to allow the Debtor to make such payments, or to prejudge such a matter when there could be legitimate objections to the Debtor's making such payments of which this court is presently unaware. However, given the obvious advantages of making and succeeding on such a motion, we are not prepared to find that the requisite "immediate, irreparable harm to the estate or the Debtor's ability to reorganize" can be shown unless and until the Debtor makes the effort to present such a motion. Similarly, we cannot find the potential harm to the interests of the employees and/or the DOL to be out-

weighed by the relative harm to the Debtor when a path is open to the Debtor which may result in no harm to any interested party. It is difficult to see how the savings in interest charges to Westminster, which would result from the Debtor's continuing to make the Program payments, would lessen its prospects for reorganization. The public interest therefore demands that such an effort be made to reach a solution to a problem which would not only benefit the Debtor's reorganizational efforts, but would benefit injured employees and lighten the burden on resources of the government's DOL, before any permanent injunction of the DOL's draw on the L/C should be granted.

We will therefore continue the injunction entered on July 11, 1991, for only a brief duration, on the condition that the Debtor file and promptly prosecute an expedited motion to make the Program payments directly. If the Debtor tries to obtain approval of such a motion and fails, we would then possibly be inclined to re-examine the *Guy C. Long* factors again in a different light. However, if the Debtor fails to try, we would have to question the good faith of its expressed intention to make certain that Program recipients are paid, a suspicion fueled by the Debtor's admitted purpose of filing this bankruptcy case in large part to obtain relief from making the Program payments.

## D. CONCLUSION

An Order consistent with the conclusions reached in this Opinion will be entered.

### ORDER

AND NOW, this 16th day of July, 1991, after a hearing of July 11, 1991, on the Debtor's Emergency Motion for Order Specifically enjoining United States Department of Labor ("DOL") from Declaring Ipso Facto Default And Seizing Collateral In Violation of the Automatic stay ("the Motion") and upon consideration of the submissions relevant thereto from the interested parties, it is hereby ORDERED as follows:

1. The DOL is stayed from demanding and accepting payment from National Westminster Bank, N.J. ("Westminster") of a letter of credit dated December 21, 1988, as amended May 5, 1989, in the total amount of $1.4 million, and Westminster is stayed from paying on the said letter of credit as amended until 5:00 P.M. on July 24, 1991, if and only if the following conditions are met:

a. The Debtor files and serves, on or before 2:00 P.M. on July 19, 1991, an expedited motion seeking a hearing on July 24, 1991, to pay all payments due, since its bankruptcy filing, to employees covered by the DOL's Office of Workers' Compensation Program ("the Program"), and appropriately prosecutes said motion; and

b. After the entry of any Order permitting such payments, the Debtor makes all payments due to the employees under the Program.

2. A hearing to determine the status of the instant injunction and to hear any motion filed by the Debtor pursuant to paragraph 1a *supra* is scheduled.