**In re SAN JACINTO GLASS INDUSTRIES, INC., Debtor.**

**Bankruptcy No. 88–05602–H5–11.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Dec. 7, 1988.

Keavin D. McDonald (Bonham, Carrington & Fox, of counsel), Houston, Tex., for debtor.

Elizabeth M. Guffy (Jenkins & Gilchrist, P.C., of counsel), Houston, Tex., for Bank of New England, N.A.

Michael S. Holmes (Lackshin & Nathan, of counsel), Houston, Tex., for William Galtney.

John Mayer (Ross, Banks, May, Cron & Cavin, of counsel), Houston, Tex., for Westinghouse Credit Corp.

Gary C. Miller (Mayor, Day & Caldwell, of counsel), Houston, Tex., for First City Nat. Bank of Houston, Independent Executor for the Estate of Lamar McCormick.

Lawrence A. Young (O'Connor, Wisner, Craig & Young, P.C., of counsel), Houston, Tex., for five petitioning unsecured creditors.

## MEMORANDUM OPINION AND ORDER REGARDING DEBTOR'S APPLICATION TO SELL PERSONAL PROPERTY

MARGARET A. MAHONEY,
Bankruptcy Judge.

### JURISDICTION

This matter is before me on motion by San Jacinto Glass Industries, Inc. (debtor) to sell personal property pursuant to 11 U.S.C. § 363. I have jurisdiction to hear this proceeding under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a), and the District Court's Order of Reference of Bankruptcy Cases and Proceedings. Since the resolution of the issues before me turns on the interpretation and application of a specific provision of Title 11, the proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N). *See also, In the Matter of J.P. Wood, M.D. and C.B. Wood*, 825 F.2d 90, 93 (5th Cir.1987).

### FACTS

San Jacinto Glass Industries, Inc. (debtor) is a Chapter 11 debtor by virtue of the filing of an involuntary Chapter 7 petition on June 30, 1988, and debtor's conversion to a voluntary Chapter 11 case on August 1, 1988. Prior to bankruptcy, debtor borrowed money and entered into security agreements with various creditors, including current claimants, First City National Bank of Houston (First City), executor of the estate of Lamar McCormick, and West-

inghouse Credit Corporation (WCC). To evidence part of its indebtedness, debtor executed a promissory note with First City for $828,900.06 on September 12, 1986. As security for the note, First City was given priority interest in debtor's accounts, chattel paper, instruments, general intangibles and current and after-acquired inventory. According to First City's proof of claim, debtor still owed $661,024 at the time of bankruptcy.[1]

WCC made two purchase money loans to debtor to finance the acquisition of certain specified production line equipment.[2] WCC has a senior perfected security interest in this equipment which at present secures an outstanding deficiency of $217,695.

To additionally secure payment of its purchase money loans, WCC required debtor to obtain an irrevocable standby letter of credit for $100,000. By its terms, the letter of credit could be drawn on by WCC if WCC presented proof of debtor's default on loan repayments. The letter of credit was personally guaranteed by debtor's Chairman of the Board, Mr. William Galtney, and his wife. The issuer of the letter of credit, Allied Bank, received as security from the Galtneys municipal bond units worth $100,000. To date, WCC has not drawn on the letter of credit even though the debtor has not made a loan payment since April 1988, over two (2) months before the bankruptcy case was filed by its creditors.

Since the filing of the petition, debtor has three times sought and obtained court authorization to sell substantial portions of its assets. These sales have been represented as a continuation of debtor's prebankruptcy plan to effect a controlled liquidation of its business. The first sale involved equipment that debtor claims was substantially all of its assets. The sale netted $460,000 the proceeds of which are being held pending the resolution of a lien dispute.

The second and third sales consisted exclusively of equipment encumbered by a WCC purchase money security interest. The proceeds of the second sale, $80,000, were paid to WCC without dispute from any party. The third sale, the subject of this proceeding, was authorized by me over creditor objections and netted $214,000. No party disputes WCC's priority claim to these proceeds. However, First City is asking this court to order a marshaling of assets to compel WCC to proceed first against the letter of credit to satisfy its claim. The proceeds of the equipment sale would then be used only to the extent needed to cover any remaining deficiency owed to WCC. If WCC were to proceed in this manner, approximately $90,000 would be made available to unsecured claimants.[3] Included in this class of creditors is First City, at least to the extent that its claim against the debtor is undersecured.

Alternatively, First City has protested the sale as being outside a plan of reorganization and asked that the proceeds be withheld from WCC until a plan is confirmed. The proceeds of the sale have been placed in escrow pending the outcome of this proceeding.

## PROCEDURE

This proceeding is normally treated as an adversary proceeding as that is defined in Bankruptcy Rule 7001(7) ("[An adversary proceeding] is a proceeding in a bankruptcy court ... (7) to obtain an injunction or

---

1. At the time the note was executed, debtor also owed First City $449,434.13 which was due to be paid on October 31, 1986. Presumably, this unsecured portion of the debt has been paid, and the outstanding indebtedness is therefore fully covered by the security agreement described herein. Whether or not this is accurate, First City stipulates that its allowed claim is less than fully secured.

2. In another transaction, debtor guaranteed a loan made by WCC to a sister company, Texas Mirror, Inc. The deficiency on that loan totals $7,128.61. The three debts were later cross-collateralized.

3.

| | | |
|---|---|---|
| Sale Proceeds | | $214,000 |
| WCC's claim | $224,824 | |
| Less: Letter of Credit Draw | 100,000 | |
| | | 124,824 |
| Proceedings Remaining for Distribution to General Creditors | | $89,176 |

other equitable relief"). However, since First City is seeking marshaling in response to debtor's motion to sell and WCC's motion to lift stay, the matter need not be brought as an adversary proceeding. *See In re Mel–O–Gold, Inc.*, 88 B.R. 205, 207 (Bankr.S.D.Iowa 1988) (under Bankruptcy Rule 7001(7), marshaling can be requested in response to any type of motion brought by another party and in that context need not be filed as an adversary proceeding).

### Marshaling of Assets

Marshaling of assets originated as a common law doctrine and enjoys continued vitality in state and federal case law. The doctrine is founded in equity, and its application in bankruptcy is supported by 28 U.S.C. § 1481 which grants bankruptcy courts the powers of a court of equity.

■ The purpose underlying marshaling "is to prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. United States*, 375 U.S. 233, 237, 84 S.Ct. 318, 321, 11 L.Ed.2d 293 (1963). The doctrine asserts that a senior lien creditor with a right to proceed against more than one asset of a debtor must, in fairness, attempt to satisfy his claim(s) from assets that are not encumbered with junior liens. By exercising such a choice, there are more funds available for distribution to other creditors of the common debtor, thus satisfying these claims to the maximum extent possible.

■ The traditional threshold requirements of marshaling are threefold: (1) the contesting claimants both have secured claims against a common debtor; (2) the assets or funds subject to marshaling belong *solely* to the common debtor; and (3) one of the lienholders, alone, has the right to resort to more than one fund or asset of the debtor. *Id.* at 236, 84 S.Ct. at 320–21.

### 1. *Secured Lienholder Requirement.*

In this case, the party invoking the marshaling doctrine, First City, is an undersecured creditor of the debtor, with outstanding claims totaling $661,024.[4] However, with regard to the equipment at issue here, First City is an unsecured creditor due to WCC's priority position as purchase money security interest holder. Both parties have stipulated to the validity and seniority of WCC's lien. In addition, First City does not claim and does not hold any enforceable interest in the letter of credit, or in any other collateral of debtor to which WCC may look for satisfaction of its claim. First City, then, holds unsecured status with regard to all assets which might be the subject of a marshaling order against WCC.

### 2. *Property of the Debtor.*

■ It is well established that credit extended by a third party on behalf of a debtor via a letter of credit is not considered property of the bankruptcy estate as defined in 11 U.S.C. § 541(a)(1). *In the Matter of Compton Corp.*, 831 F.2d 586, 589 (5th Cir.1987). The same is true of proceeds distributed pursuant to a letter of credit. *Id.* This view, however, does not hold for the party who is entitled to receive payment via a letter of credit. Such right to payment is deemed the property of the beneficiary, even if not exercised until after bankruptcy. *Farmer v. Crocker Nat'l. Bank, (In re Swift Aire Lines, Inc.)*, 20 B.R. 286, 288 (Bankr.C.D.Cal.1982). The facts of this case indicate that WCC is entitled to draw on the letter of credit as the beneficiary of the contract made between the issuer, Allied Bank, and the debtor. There is no indication in the record that the terms of the agreement require WCC to first proceed against the equipment purchased with the loan proceeds. While WCC's reliance on the letter of credit might be viewed as contingent, WCC nonetheless holds an undisputed legal right to receive payment from the letter of credit. Therefore, the letter of credit and its proceeds are to be considered the property of WCC, and not that of the debtor.

**4.** See footnote 1, *supra.*

### 3. *Unencumbered Access to All Funds.*

■ The hallmark of the marshaling doctrine is contained in the requirement that one creditor alone have access to more than one of the debtor's assets by which to realize its claim. In equity, the paramount creditor's power to make discretionary choices regarding sources of repayment should be tempered but only to the extent necessary to insure that other deserving creditors be spared needless adverse effects. *Meyer,* 375 U.S. 233, 237, 84 S.Ct. 318, 321. No equitable remedy can encumber the paramount creditor, or otherwise jeopardize his right to fully realize his claims. 2 J. Story, *Commentaries on Equity Jurisprudence* § 869, at 247 (14th Ed. 1918). *See also, Peoples Bank of Tuscaloosa v. Computer Room, Inc., (In re Computer Room, Inc.),* 24 B.R. 732, 736 (Bankr.N.D.Ala., W.D.1982).

■ It has already been shown that WCC has the right to draw against the letter of credit if it chooses to do so. The procedure involved would not require any resort to the court for prior authorization since the payment is not deemed to be a transfer of assets in violation of the automatic stay provisions of 11 U.S.C. § 362. *Braucher v. Continental Illinois Nat'l. Bank and Trust Co. of Chicago, (In re Illinois–California Exp., Inc.),* 50 B.R. 232, 235 (Bankr.D.Colo.1985). There are no known legal impediments to drawing on the letter, such as fraud in the making of the credit arrangements. As to the purchase money security interest in the equipment, the proceeds of the equipment sale are presently being held in escrow. WCC need only obtain court authorization based on a favorable disposition of this proceeding before accessing these funds. In short, there would be no inequitable hardship placed on WCC if they were ordered by this court to proceed first against either fund.

It should be noted that First City, as unsecured creditor, does not have access to either fund which is the subject of its marshaling request. Such access is another one of the traditional requirements of marshaling that has not been met by First City as the party seeking marshaling.

### 5. *Applications of the Marshaling Doctrine.*

First City is asserting that their unsecured creditor status and the fact that one of the funds is not property of the debtor should not prevent marshaling in this case. First City relies upon the case of *In re Jack Green's Fashions for Men—Big & Tall,* 597 F.2d 130 (8th Cir.1979), and the line of cases following this controversial 8th Circuit decision.[5] WCC contests application of this line of cases, noting that other circuits and commentators have severely criticized the extension of such equitable remedy to unsecured creditors.

■ The bankruptcy courts have broad equitable powers as provided under 28 U.S.C. § 1481. However, equitable remedies such as marshaling should be administered with temperance to prevent established commercial standards from being undermined in the process. As aptly described in *Matter of Samuels & Co., Inc.,* 526 F.2d 1238 (5th Cir.1979), equity courts are not to engage in reworking commercial law merely to avoid certain undesirable results. So while the marshaling doctrine should be invoked to effect an equitable result, it should, to the extent possible, uphold the rights and duties that parties contract for when undertaking business transactions. That is why the traditional requirements for marshaling have been strictly construed. However, in light of the new, broadened applications of the doctrine, a study of commercial and bankruptcy ramifications is in order to test the strictness of the marshaling requirements and their suitability to this case.

The marshaling elements that the *Jack Green's* line of cases tries to soften are (1) the lack of standing of an unsecured creditor, and (2) the property-of-the-estate re-

**5.** The line of cases that has followed this decision is *In the Matter of Multiple Services Industries, Inc.,* 18 B.R. 635 (Bankr.E.D.Wis.1982); *In re Tampa Chain Co., Inc.,* 53 B.R. 772, 13 B.C.D. 792 (Bankr.S.D.N.Y.1985); and *Farmers and Merchants Bank v. Gibson,* 81 B.R. 83 (Bankr.N. D.Fla.1984), *aff'd.,* 81 B.R. 84 (N.D.Fla.1986).

quirement. The courts have found a means to "end-run" these requirements in the name of equity. To satisfy the standing issue, courts have granted to the bankruptcy trustee (or the debtor-in-possession) the status of hypothetical judgment lien creditor, as defined in 11 U.S.C. § 544(a).[6] As for the property requirement, courts have sought a means to either reclassify a particular fund or asset as that of the bankruptcy debtor (the "two fund" theory) or alternatively, to view the actions of a debtor's guarantor in such a way as to characterize the guarantor as an alter-ego of that debtor, i.e., piercing the corporate veil (the "common debtor" theory).

The *Jack Green's* decision does not offer findings or otherwise justify relaxing the common debtor/two fund requirement. In that case, a bank made loans to a corporation and took a security interest in the debtor's business assets and in personal real estate holdings of the guarantors, two of the debtor's controlling shareholders. The corporation and the shareholders all filed for bankruptcy. Upon request by the trustee, the bankruptcy court ordered the bank to first proceed against the real estate of the guarantor-shareholders before going after the business assets of the debtor. The 8th Circuit Court of Appeals sustained this ruling, reasoning that it would be "in the highest degree inequitable" to exhaust the corporation's assets before looking to the guarantors for satisfaction of its claim.

Because the 8th Circuit Court of Appeals did not elaborate on its reasons for upholding the general creditor's marshaling motion, this district has not followed *Jack Green's*. *In re Mesa Intercontinental, Inc.*, 79 B.R. 669, 672 n. 1 (Bankr.S.D.Tex. 1987) (describing the decision as an unclearly reasoned departure from the majority view).

Following the precedent established in *Jack Green's*, the court in *Farmers & Merchants Bank v. Gibson*, 7 B.R. 437 (Bankr. N.D.Fla.1980) attempted an exceptional application of marshaling by using § 544(a) to grant standing to the trustee and using a "reliance theory" so as to deem the proceeds of a guaranteed loan a capital contribution to the debtor's estate. In that case, a working capital loan was personally guaranteed by the debtor corporation's president and principal stockholder and also by his spouse. Security for the loan included real and personal assets of the guarantors and a second mortgage on their personal residence. A loan note covering the guarantee was co-signed by the corporation and the individuals. While the court acknowledged sound reasons for otherwise upholding the three traditional marshal requirements, the court observed that the working capital loan could have induced suppliers and service providers to extend credit to the debtor. In that light, the loan guarantee could be construed as a contribution to capital. Accordingly, the general creditors were to be given greater equitable considerations than the loan guarantors would otherwise enjoy, and marshaling was ordered. The court chose to marshal by directing the creditor-bank to proceed first against the guarantor's assets. The trustee was then subrogated to the bank's right to any surplus from these liquidations.

On appeal, the opinion was vacated and remanded to the bankruptcy court for further findings on the issue of whether the act of co-signing the note improperly served as partial substantiation for finding the guarantee collateral to be property of the debtor. More significantly, the district court found that the contribution to capital determination was unsubstantiated in that there was no corroborating evidence such as (1) corporate control by the guarantors, (2) treatment of the guarantees as a capital contribution, or (3) undercapitalization of the corporation at the time the loan was made. *Peacock v. Gibson*, 81 B.R. 79 (N.D. Fla.1981). Upon remand, the bankruptcy court found that the creditor bank had already foreclosed on all available nonexempt property of the guarantors. Ruling that the homestead claim of the guarantors was

---

6. *See* House and Senate Reports (Reform Act of 1978) following Section 544 (trustee has rights of a creditor on a simple contract with judicial lien on debtor's property or a credit with an unsatisfied writ of execution, as of petition date).

superior to that of a judgment lien creditor, the court refused to allow foreclosure on the second mortgage. This mooted the marshaling issue since the bank was not able to collect its entire claim against the guarantor's nonexempt assets. Therefore, the trustee would not realize any additional money under a marshaling-by-subrogation order. *Farmers and Merchants Bank v. Gibson*, 81 B.R. 81, 82 (Bankr.N.D.Fla. 1984).

On reconsideration, the court vacated this ruling due to factual inaccuracies. However, the court found no material error in the previous findings and therefore reasserted that marshaling was not applicable to the exempted property in this case. *Farmers and Merchants Bank v. Gibson*, 81 B.R. 83 (Bankr.N.D.Fla.1984), vacating *Farmers and Merchants Bank v. Gibson*, 81 B.R. 81 (Bankr.N.D.Fla.1984). On appeal, the district court affirmed the exception given to the exempt property. The court also acknowledged that marshaling against nonexempt properties of the guarantors would have been moot since the insufficiency of such collateral would require the bank to foreclose against the corporate debtor's assets to fully satisfy its claim. In essence, the bankruptcy court didn't need to reach the marshaling issue in this case. However, the reasoning of the case makes clear that the court would entertain a possible exception to the common debtor requirement under a contribution to capital theory. *Gibson v. Farmers and Merchants Bank*, 81 B.R. 84, 87 (N.D.Fla. 1986).

In *In re Tampa Chain Company, Inc.*, 53 B.R. 772, 13 B.C.D. 792 (Bankr.S.D.N.Y. 1985), a bankruptcy trustee succeeded in getting common debtor status applied to shareholder-guarantors. In that case, the court found that the creditor-bank loaned working capital funds in large part on the strength of the guarantee which was collateralized with the personal assets of the guarantors. However, the court also found inequitable business conduct on the part of the guarantors with which to support its marshaling order. The court found that the guarantors had essentially used the debtor corporation as a "personal piggy bank" (*Id.*, 53 B.R. at 779, 13 B.C.D. at 796). The evidence showed that the guarantors were the recipients of a significant proportion of the corporate borrowings, had paid in capital to the corporation but later withdrew an even greater amount of funds, and had used the corporate funds to pay for expenses of a strictly personal nature. This combined showing of inequitable guarantor conduct, along with lender reliance on the guarantor's collateral (versus that of the corporation), supported the court's finding of a "common debtor," thereby justifying marshaling.

In *In the Matter of Multiple Services Industries, Inc.*, 18 B.R. 635 (Bankr.E.D. Wis.1982), the court ordered a creditor bank to marshal assets and to look first to the guarantors on a corporate debt before claiming against the assets of the corporate debtor. The guarantor, an officer and shareholder of the debtor, had secured his guarantee with a second mortgage on his personal residence. Responding to the request of the trustee, the court ordered marshaling under a contribution to capital theory, even though there was no other mitigating evidence with which to support a common debtor exception. Furthermore, the court did not give much weight to the fact that the creditor bank was having to suffer the extra expense, delay and risk of foreclosing and paying off the first mortgage on the residence rather than proceed directly against the debtor's assets. The court noted plainly that marshaling will not always be denied because there is a delay in enforcing one's rights as a secured creditor.

## DISCUSSION

 As seen in the above cases, courts will find that the personal property of a debtor's guarantor can be reached under certain circumstances. In reviewing these minority decisions, I agree in principle with the notion that bankruptcy courts should allow marshaling even when, at times, strict adherence to the common debtor requirement has not been met. *See also* Weintraub and Resnick, "From the Bankruptcy Courts," U.C.C.L.J., vol 18:364, 369–

370 (1986). What seems to be lacking from the above decisions however is a set of standards by which courts and those privy to commercial transactions may test guarantor behavior for primary liability under a marshaling order. As one commentator has noted, the obligation to which the guarantor submits is the contingent claim of the secured creditor with whom he contracts. *See* Lachman, "Marshaling Assets in Bankruptcy: Recent Innovations in the Doctrine," 6 Cardozo L.Rev. 671, 677 (1985). If the law is going to delimit this guarantor's liability and contrarily limit the secured creditor's rights of enforcement against the principal in deference to the equitable claims of unsecured creditors, the law should also carefully define when such a result is to be justified. Future loan transactions will be seriously impaired if the courts do not stand by the contractual expectations of all parties to the transaction. As stated by Story in his treatise on equity law:

> Where a creditor has a right to resort to two persons who are his joint and several debtors, he is not compellable to yield up his remedy against either, since he has a right to stand upon the letter and spirit of his contract **unless some supervening equity changes or modifies his rights.**

2 J. Story, *Commentaries on Equity Jurisprudence,* § 866 at 245 (14th Ed.1918) (emphasis added).

The concern for non-justified interference with the regularity of commercial transactions was aptly described in *Stuhley v. U.S. S.B.A.* (*In re United Med. Research, Inc.*), 12 B.R. 941 (Bankr.C.D.Cal. 1981) where the court refused to allow marshaling of a guarantor's assets without a strong showing of inequitable conduct with which to justify piercing the corporate veil.

> It is poor policy for courts to upset legitimate business transactions because of some vague concept of equity. We tend to forget that these decisions affect future commercial transactions. *Id.* at 943.

The court went on to warn that the guarantor of corporate loans would feel more insecure and less willing to facilitate such financing for fear of losing his personal assets through marshaling. *Id.*

■ In the spirit of the foregoing, I endorse the approach to marshaling in bankruptcy advanced in *Chittenden Trust Co. v. Sebert Lumber Co., Inc.,* (*In re Vermont Toy Works, Inc.*), 82 B.R. 258 (Bankr.D.Vt.1987). That court ruled that exceptions to marshaling should be applied only when the moving party presents clear and convincing evidence of (1) the basis of the marshaling exception and (2) inequitable conduct by the person(s) or entity whose assets are subject to marshaling. *Id.* at 314.

As to the "two fund" or "common debtor" requirement, *Vermont Toy* recognized a "contribution to capital" exception but the court would not grant marshaling relief unless the facts also revealed a showing of "sufficient inequitable conduct" on the part of the guarantor. *Id.* at 319. The court cited with approval the case of *In re Tampa Chain Co., Inc., supra,* as applying this two-prong test.

The *Vermont Toy* court also recognized a common debtor exception when sufficient evidence of inequitable guarantor conduct supported a finding of an alter-ego relationship between corporate debtor and guarantor. However, while many courts recognize the exception, it has been rarely applied because of "lack of proper allegation or evidence". *Id.* at 320–321. *See also, Coors of N. Miss. v. Bank of Longview, et. al,* (*In re Coors of North Mississippi, Inc.*), 66 B.R. 845 at 867 (Bankr.N.D.Miss. 1986).

■ Putting this standard of proof to the facts of this case, it is seen that First City falls short of carrying its burden of pleading and proof. First City does little more than reason that the unsecured creditor's estate would be benefitted by a marshaling of assets in this case. At no point does First City allege inequitable conduct by the guarantor, William Galtney. Neither does it put forth grounds on which to find an alter-ego relationship between the debtor company and its president/guarantor. Neither does it allege its inducement to extend credit to the debtor based on the

receipt by the debtor of working capital loan proceeds as a result of the Galtneys' guarantee. The cases used to support its position, *Green's, Farmers* and *Tampa Chain,* are cited only for the notion that secured creditors can be required to first look to the property of a shareholder/guarantor before proceeding against the corporate debtor's assets. While the *Tampa Chain* case reasoning and result support First City's position, First City has not shouldered its burden of proof with which to effect the same outcome here. In short, there is insufficient evidence in the record with which to justify an equitable exception to the rules governing the commercial transaction at issue here. Without such an exception, First City's motion for marshaling cannot be granted.

The spirit of the Code protects the value of the debtor's estate while it tries to minimize detrimental effects to creditors. In this vein, this court is required to review the competing equities and legal rights of all parties-in-interest. Where, as here, the unsecured creditor has failed to plead and present evidence of conduct or circumstances that would justify elevating its rights over those who have taken steps to protect their claim, there are no supervening equitable rights to be recognized. The law of commercial transactions will not be modified by the Bankruptcy Court unless and until a claimant establishes that his equitable rights are at least equal to those who have otherwise waived the protections of their legal rights through wrongdoing or overreaching. There is no evidence of such conduct here, nor has First City so plead that this was the case.

For the reasons stated, First City's motion to compel WCC to draw against its letter of credit with Allied Bank is therefore denied.

### Sub Rosa Plan of Reorganization

First City's contention that the sale of equipment to Viracon is a *sub rosa* plan of reorganization is partially mooted by this court's authorization to sell the assets given at the hearing held September 19, 1988. Further, the decision to disallow First City's motion to order marshaling of assets clears the way for WCC to obtain the proceeds of said sale. As WCC has aptly pointed out in its brief, this sale does not represent the bulk of debtor's original estate. Two earlier sales of debtor's assets were authorized by this court that involved substantially all of debtor's assets. (*See* Order, "Emergency Application to Sell" signed July 27, 1988, and Order, "Debtor's Application to Sell Equipment," signed August 16, 1988). Together those sales netted $520,000, more than two times the amount of proceeds that this third sale has yielded. If First City takes issue with such sales being conducted outside of a plan of (liquidating) reorganization, it is odd that First City raised no objection to the second sale.

Furthermore, prior to being involuntarily forced into bankruptcy, the debtor had undertaken a program of controlled liquidation of the business. Beginning in April 1988 and thereafter until petition time, the debtor had been seeking to sell his production equipment at fair market prices to interested buyers. After petition date, the debtor has sought court authorization to continue with these liquidating sales. Since all parties are aware of debtor's intentions, and since the vast majority of secured claims are undisputed, the only real issue presented to the court is whether the proposed sale is for fair market value. Since all parties to the hearing agreed that the sales prices were market prices for the equipment, that issue is not even present here.

It should also be noted that the debtor has a proposed plan of reorganization on file which calls for the full satisfaction of all allowed secured claims. Under the terms of this plan, which has not yet been considered by the parties in interest, WCC's claim is to be satisfied from sales of equipment in which WCC held a purchase money security interest. Other secured claimants will be paid from sales of all other equipment and inventory. Given that WCC's priority claim to the proceeds is undisputed, and since marshaling will not be ordered in this case, I do not see that anything will be gained by making WCC

wait for the funds that, by all accounts, will eventually be paid to them.

### 1. Distinguishing the Braniff Line of Cases.

First City contends that a distribution of sale proceeds should not occur outside a confirmed plan of reorganization unless there is a showing of extraordinary circumstances. First City cites *In re Conroe Forge & Manufacturing Corp.*, 82 B.R. 781 (Bankr.W.D.Pa.1988); *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983); and *In re White Motor Credit Corp.*, 14 B.R. 584 (Bankr.N.D.Ohio 1981) to support its position.

*Braniff* established a standard for reviewing a proposed Section 363 transaction for sale, or use or lease of the estate's property outside the ordinary course of business. The transaction in *Braniff* essentially involved a "swap" of travel benefits on the purchaser-airliner in exchange for Braniff's terminal leases and landing slots. Acceptance of the deal was conditioned on obtaining certain concessions by the creditors of Braniff. These included compromising or releasing claims against the airline, and automatically endorsing any plan of reorganization approved by a majority of the creditor's committee.

The *Braniff* court found that the voting curtailment and the release of claims provisions went beyond the scope of § 363. The court stated that when a transaction attempts to specify the terms of a reorganization plan, the parties must go through the Chapter 11 requirements of disclosure (11 U.S.C. § 1125), voting (§ 1126), and best interest of creditor's test (§ 1129(b)(2)(B)). *Id.* at 940. Application for authority to sell would not be appropriate for such a far-reaching proposal as was the "conditioned swap" of *Braniff.* By contrast, there are no such limiting provisions or implications here. Disbursement of the funds to WCC will not materially dictate the terms of the debtor's reorganization nor otherwise endanger the creditor protections available to First City as an unsecured creditor.

*Conroe Forge* has cited with approval the *Braniff* concerns that Chapter 11 confirmation requirements not be short-circuited. 82 B.R. 781, 784. The *Conroe* case also puts forth the "best interest of all parties in interest" standard for reviewing § 363 sale applications. *Id.* at 787. However, the *Conroe* creditor was denied distribution of sale proceeds in part because of two factors not present in the instant case. In *Conroe*, there was some question as to whether the creditor's claim was "allowed" pursuant to Bankruptcy Rule 3021. WCC's claim is, by contrast, uncontested by the debtor and the other creditors. While it is true that the plan and disclosure statement have not yet been approved by the parties, there is no known impediment to giving WCC full allowance for its outstanding claim.

Second, the *Conroe* creditor was undersecured, and was seeking the "indubitable equivalent" of its claim by compensation equivalent to a lender's rate of interest on a loan. The *Conroe* creditor sought reimbursement for the "cost of delay" caused by the automatic stay provisions of the Bankruptcy Code. The court ruled that the creditor's lien on the sale proceeds was adequate protection, especially since these funds were then drawing interest in an escrow account. In a similar vein, WCC had once sought adequate protection through immediate foreclosure or possession of the equipment because of debtor's failure to carry insurance, maintain the lease for the host building, or otherwise protect the value of the collateral. However, that issue is of no consequence here where the sale has been made and the full value of the collateral realized. Furthermore, the *Conroe* court was concerned that allowing preplan distributions would take away the incentive for the Chapter 11 debtor to file a disclosure statement and a plan of reorganization. The debtor in this case has already made these required filings. As stated, the proposed plan provides for the liquidating trustee to disburse these sale proceeds to WCC as part satisfaction of WCC's claim against the debtor.

The *White Motor* case re-established the requirement that there be extraordinary or

emergency circumstances before pre-plan sale proceeds are disbursed to creditors. However, that case noted the split in the circuits on this point. The standard for the Fifth Circuit is taken from *In re Dania Corp.*, 400 F.2d 833 (5th Cir.1968), *cert. denied*, 393 U.S. 1118, 89 S.Ct. 994, 22 L.Ed.2d 122, *reh. denied*, 394 U.S. 994, 89 S.Ct. 1455, 22 L.Ed.2d 771 (1969). That court permitted such sales if the best interest of the estate was served thereby, i.e., the transaction maximized or prevented diminution in the value of the estate's assets. This approach is also used by the Seventh and Ninth Circuits.

I find persuasive the reasoning in *In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir.1986). There the court reviewed a pre-plan long-term lease of airplanes to service the Pacific flight routes of the debtor airline that would have cost a substantial amount of money. The court stated that § 363(b) motions implicitly require an articulated business reason since the transaction is outside the ordinary course of business. The court looked to the case of *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir.1983), for a nonexhaustive list of factors that courts might use to measure the sufficiency of the business justification in light of furthering the interests of debtor, creditors and equity holders alike. *Id.* at 1226. I have previously considered debtor's § 363(b) motion and have found sufficient business justification for allowing the equipment sale to go forward.

After § 363(b) was satisfied, the *Continental* court then tested the transaction against pertinent § 362 provisions to see if there were any automatic stay or adequate protection violations resulting from it. If none were found, then presumably the transaction satisfied all § 363 requirements and, similarly, most creditor objections.

The *Continental* court has likewise indicated that § 363 is not to be used as a means of undertaking a reorganization piecemeal. If a § 363(b) transaction effectively specifies the terms of a reorganization plan, then creditors would be denied their rights under Chapter 11. At the same time, the court also recognized the

application of § 363 to certain situations, without the need to conduct a "mini-hearing on plan confirmation." In an attempt to balance these two considerations, the court held that objectors to § 363(b) claims must specify exactly what protection is being denied. *Id.* at 1228. If the court then concludes that there has been a denial of protection, "appropriate protective measures modeled on those which would attend a reorganization plan" can be devised. *Id.*

I cannot find in this case any protections that are being denied to First City as a result of the sale of the asset and the proceeds. First City is an unsecured creditor here and therefore cannot be considered for adequate protection under § 363(e). First City's objection is based on there being no extraordinary circumstances which might pass the *White Motor* test for § 363 transactions. Since I have chosen to use the business judgment-creditor protection standard established in *Continental*, there need be no showing of special or timely circumstances other than those which would support a sound business reason for the transaction. Therefore, I stand by my decision to authorize the sale. By extension, and based on the above, I can find no reason to withhold the proceeds from the party who holds an undisputed secured claim to them, who stands to receive the proceeds at some point in the future, and who will not jeopardize the protections otherwise available to First City by taking these proceeds outside of a confirmed plan of reorganization.

It is therefore ORDERED that:

(1) debtor's application for sale of equipment to Viracon be granted;

(2) that First City National Bank of Houston's application for marshaling be denied; and

(3) that Westinghouse Credit Corporation, (WCC), as priority and sole lienholder against said equipment, be paid the proceeds of such sale to the extent of any outstanding claims owed to WCC by the debtor.