**In re: TORCH OFFSHORE, INC.**
**Torch Offshore, L.L.C. Torch**
**Express, L.L.C.**

No. CIV.A. 05–2193.
Bankruptcy Nos. 05–10140,
05–10137, 05–10138.

United States District Court,
E.D. Louisiana.

June 24, 2005.

Alan Harry Goodman, David F. Waguespack, Stephen R. Remsberg, Lemle & Kelleher, LLP, New Orleans, LA, for Official Committee of Unsecured Creditors of Torch Offshore, Inc., Torch Offshore, LLC, and Torch Express, LLC, Appellant.

Jan Marie Hayden, Clayton Thomas Hufft, Heller, Draper, Hayden, Patrick & Horn, LLC, New Orleans, LA, Stewart Foster Peck, Christopher Todd Caplinger, Jennifer M. Stierman, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, New Orleans, LA, for Torch Offshore, Inc., Torch Offshore LLC, Torch Express LLC, Appellees.

William Thomas Finn, Leann Opotowsky Moses, Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux, New Orleans, LA, for Regions Bank, Appellee.

Henry A. King, Anne Elizabeth Briard, Michael L. Vincenzo, Robert J. Burvant, Robert J. Stefani, Jr., King, LeBlanc & Bland, LLP, New Orleans, LA, for General Elec. Capital Corp., appellee.

Edward Henry Arnold, III, Seth Adam Levine, Baker Donelson Bearman Caldwell

& Berkowitz, PC, New Orleans, LA, for Export Development Canada, appellee.

Daniel Alfred Tadros, Harry Ross Holladay, Scott Allen Soule, Chaffe, McCall, Phillips, Toler & Sarpy, LLP, New Orleans, LA, for C–MAR America, Inc., appellee.

Paul J. Goodwine, Schully, Roberts, Slattery, Jaubert & Marino, New Orleans, LA, for Cal Dive Intern., Inc., appellee.

Richard K. Leefe, Leefe, Gibbs, Sullivan, Dupre & Aldous, Metairie, LA, EPIC Divers Inc, appellee.

## OPINION

LEMMON, District Judge.

The bankruptcy court's orders approving the sales of the debtor's assets under 11 U.S.C. § 363 (Documents 827, 828, 829, 830, and 832) and the bankruptcy court's order approving the General Electric Capital Corporation settlement (Document 677) are **AFFIRMED**. The Committee's request for a stay pending appeal to the United States Court of Appeals for the Fifth Circuit is **DENIED**.

### A. Background.

On January 7, 2005, Torch Offshore, Inc., the owner and operator of an 11–vessel fleet in the Gulf of Mexico, filed a petition for bankruptcy protection under Chapter 11.[1] Since entering bankruptcy protection Torch has repeatedly expressed its intention to sell off all or most of its assets due to its declining prospects for successfully reorganizing its business. ·On April 6, 2005, Torch filed a motion seeking bankruptcy court approval of the sale of the majority of its assets under 11 U.S.C. § 363(b) to Cal Dive International, Inc. for

$92 million. At a hearing on Torch's motion on April 27, 2005, Torch modified its proposal to reflect that (1) three vessels, the *Midnight Eagle, Midnight Gator*, and *Midnight Wrangler*, that were subject to a lien in favor of General Electric Capital Corporation ("GECC") would be sold to GECC for $18.36 million, or to the highest bidder; and (2) six vessels, the *Midnight Express, Midnight Star, Midnight Carrier, Midnight Brave, Midnight Dancer*, and *Midnight Rider*, would be sold to Cal Dive for $80 million, or to the highest bidder. One other vessel, the *Midnight Fox*, estimated to bring in $2 million, would be auctioned separately. The effect of these sales would be to divest Torch of all of its operating assets.

On May 4, 2005, the bankruptcy court approved the sales procedures, and the auctions took place on June 2, 2005. An $18.36 million offer by GECC was the highest bid on the vessels subject to its lien. An $80.45 million offer by Cal Dive was the highest bid on the six vessels covered by its original proposal, and a $2.55 million offer by Cal Dive was the highest bid on the *Midnight Fox*. Epic Divers was the highest bidder, at $2.8 million, on certain other equipment. The total amount of the proposed sale is $85.8 million.

On June 8, 2005, the bankruptcy court conducted a hearing on whether to approve the sales. The Official Committee of Unsecured Creditors (the "Committee") objected to the sales, arguing that they constituted a *sub rosa* plan of reorganization and violated the standards announced in *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983) and *In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986). The bankruptcy court specifically

---

**1.** Two other Torch subsidiaries, Torch Offshore, L.L.C. and Torch Express, L.L.C. also sought Chapter 11 bankruptcy protection.

The three cases are being jointly administered. The Torch entities are referred to collectively as "Torch" or "the debtor."

instructed counsel for the Committee that under the theory of *Continental,* he had to "show specifically what protection is being denied to you by these sales under Section 363," and asked counsel several times to identify "what rights, what benefits are the unsecured creditors being deprived of by this sale rather than a sale through—rather than the benefits that would accrue to them under a plan of reorganization?"[2] Although counsel for the Committee indicated that it wished the opportunity to file a reorganization plan, the court perceived that the unsecured creditors would receive no payments either under the sales or through a reorganization plan,[3] and termed the Committee's objections to the asset sales to be "not specific enough to satisfy me or to satisfy the test from *Continental Air Lines.*"[4]

At the end of the hearing, the court orally approved the sales, and entered written orders of approval on June 15, 2005. The court rejected the Committee's argument that the sales violated the standards of *Continental* and *Braniff:*

> I'm going to overrule all of the objections filed to that [the June 2, 2005 sales] and grant the motion for an order approving that sale. I say in passing I think my questions and comments furnished enough reasons why I'm overruling the objection of the Creditors' Committee based on this being a violation of *Braniff* and its progeny. I don't believe that *Braniff* prohibits this sale under Section 363(b), and to the contrary I think that the cases following *Braniff,* specifically *Continental, Cajun Electric,* and *Cond[ere]* and other cases we dis-

cussed permit it in this instance and I specifically hold that the Creditors' Committee has not carried its burden of showing that it has lost any rights that would be secured to it by a plan of reorganization.[5]

The Committee appeals the ruling of the bankruptcy court approving the sales, arguing that there is no business justification for the sales and that they constitute a *sub rosa* reorganization plan in violation of *Braniff.* The Committee also challenges the debtor's settlement with GECC.

## B. Analysis.

### 1. Standard of Review

■ It is well established that "a bankruptcy court's findings of fact are reviewed for clear error while conclusions of law are reviewed *de novo." Carrieri v. Jobs.com, Inc.,* 393 F.3d 508, 517 (5th Cir.2004). Under the clearly erroneous standard, reversal is appropriate "only if, on the entire evidence," the reviewing court is "left with the definite and firm conviction that a mistake has been made." *Id.*

### 2. The proposed asset sales.

■ 11 U.S.C. § 363(b) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." In *In re Continental Air Lines, Inc.,* 780 F.2d 1223 (5th Cir. 1986), the debtor sought to enter into leases for new aircraft under § 363 after filing bankruptcy. Certain institutional creditors objected. The court held that when a proposed use, sale, or lease of assets is outside the ordinary course of

---

**2.** Transcript of Proceedings, June 8, 2005 (Document 853) at p. 47; *see also id.* at p. 55 ("No, I'm not asking you to prove an impossibility. I'm asking you to specify exactly what you're being denied.").

**3.** *See id.* at 49 ("But my point is it's zero and it's going to be zero in any case.").

**4.** *Id.* at 55.

**5.** *Id.* at pp. 107–08.

business, the first step is for the debtor in possession to demonstrate that there are "business justifications" for the proposed transaction, necessitating an analysis of the factors enunciated in *In re Lionel Corp.,* 722 F.2d 1063 (2d Cir.1983):

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*Continental,* 780 F.2d at 1226. Additionally, lower courts facing a proposal to use, sell, or lease assets outside the ordinary course of business must determine "whether the proposed transactions otherwise violate or are incompatible with the provisions of Chapter 11,"[6] including the requirement that the sales not be a *sub rosa* plan of reorganization prohibited by *In re Braniff Airways, Inc.,* 700 F.2d 935 (5th Cir.1983).

### a) Are there business justifications for the proposed sales?

Consideration of the *Lionel* factors clearly reveals that there are business justifications for the asset sales. The fact that the sales encompass virtually all of the assets of the estate is not determinative, but one consideration in determining whether there is a business justification for the proposed sales. The auctions occurred approximately six months after the filing of the bankruptcy petition, and during these six months the debtor explored whether it could reorganize its business or had to liquidate its operating assets. No plan of reorganization has been proposed, and there is no indication that a sale of the debtor's assets pursuant to any such plan would result in a greater value to the estate than the proceeds realized by the auctions. The Committee points out that the assets were recently appraised at $228 million, but this is not an indication of market value because no firm was willing to offer this amount at the well advertised twelve-hour-long auctions, during which the debtor received almost 100 bids. Most importantly, the undisputed evidence before the bankruptcy court indicated that maintaining the vessels was costing the debtor an exorbitant amount of money, and the condition of the vessels was deteriorating over time. The court affirms the bankruptcy court's finding that there are sound business justifications for the asset sales.

### b) Do the asset sales exceed the scope of § 363(b)?

The Fifth Circuit examined the scope of § 363(b) in *In re Braniff Airways, Inc.,* 700 F.2d 935 (5th Cir.1983). The *Braniff* debtor entered into an agreement to dispose of all of its assets to an entity known as PSA in exchange for travel scrip. Numerous creditor objections were filed. The court held that the PSA Agreement was invalid because the transaction was "much more than the 'use, sale or lease' of Braniff's property authorized by § 363(b):"

> Three examples will illustrate our rationale. The PSA Agreement provided that Braniff would pay $2.5 million to PSA in exchange for $7.5 million in scrip entitling the holder to travel on PSA. It

---

6. *Id.* at 1227.

further required that the scrip be used only in a future Braniff reorganization and that it be issued only to former Braniff employees or shareholders or, in a limited amount, to unsecured creditors. **This provision not only changed the composition of Braniff's assets, the contemplated result under § 363(b), it also had the practical effect of dictating some of the terms of a future reorganization plan.** The reorganization plan would have to allocate the scrip according to the terms of the PSA agreement or forfeit a valuable asset. **The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets.**

Second, under the agreement between Braniff and its creditor, the secured creditors were required to vote a portion of their deficiency claim in favor of any future reorganization plan approved by a majority of the unsecured creditors' committee. Again, such an action is not comprised by the term "use, sell, or lease," and it thwarts the Code's carefully crafted scheme for creditor enfranchisement where plans of reorganization are concerned.

Third, the PSA transaction also provided for the release of claims by all parties against Braniff, its secured creditors and its officers and directors. On its face, this requirement is not a "use, sale or lease" and is not authorized by § 363(b).

*Id.* at 940 (emphasis added). The court therefore determined that the PSA Agreement was not authorized under § 363(b):

[W]e hold that the district court was not authorized by § 363(b) to approve the PSA transaction and that its order is

reversed. In any future attempts to specify the terms whereby a reorganization plan is to be adopted, the parties and the district court must scale the hurdles erected in Chapter 11. Were this transaction approved, and considering the properties to be transferred, little would remain save fixed based equipment and little prospect or occasion for further reorganization. These considerations reinforce our view that this is in fact a reorganization.

*Id. Braniff* requires review of agreements that do more than constitute the simple "use, sale or lease" of assets to ensure that they do not exceed § 363(b) and constitute *sub rosa* plans of reorganization. *See Matter of The Babcock & Wilcox Co.,* 250 F.3d 955, 960 (5th Cir.2001) (*"Braniff* stands merely for the proposition that the provisions of § 363 permitting a trustee to use, sell, or lease the assets do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan."); *see also* 3 *Collier on Bankruptcy* ¶ 363.02[4], at 363–20 (Lawrence P. King ed., 15th ed. 1996) ("Attempts to determine plan issues in connection with the sale [under § 363(b) ] will be improper and should result in a denial of the relief requested.")

*In the Matter of Cajun Electric Power Cooperative, Inc.,* 119 F.3d 349 (5th Cir. 1997) illustrates the limits of *Braniff.* The *Cajun Electric* debtor entered into a settlement regarding its obligations connected with the River Bend nuclear reactor (paying some monies, giving up some claims, and being released from future obligations pertaining to the plant). The court approved the settlement, rejecting the arguments of the creditors of the debtor that it was prohibited by *Braniff:*

The instant settlement is not a *sub rosa* reorganization of the type disapproved in *Braniff.* It does not dispose of all claims against Cajun, nor does it restrict creditors' rights to vote as they deem fit on a proposed reorganization plan. Finally, the settlement does not dispose of virtually all of Cajun's assets, leaving "little prospect or occasion for future reorganization." [7] Instead it disposes of one particular "asset," River Bend, which is not so much the crown jewel of Cajun's estate but its white elephant. The removal of River Bend from the estate will facilitate Cajun's reorganization, and will do so without denigrating the rights of the unsecured trade creditors.

Undeniably, the settlement removes $107 million in cash and transmission lines worth $20 million from the debtor's estate; it also precludes Cajun from pursuing litigation—an uncertain prospect at best—against Gulf States and RUS. However, Cajun retains as much as $1.1 billion in non-River Bend assets. In sum, the settlement does not "alter creditors' rights, dispose of assets, and release claims to the extent proposed in the wide-ranging transaction disapproved in" *Braniff.* The cases are entirely distinguishable, and the settlement at issue does not effect a *sub rosa* plan.

*Id.* at 355 (citations omitted).

Because "each hearing on a § 363(b) transaction cannot become a mini-hearing on plan confirmation," the *Continental* court held:

> that when an objector to a proposed transaction under § 363(b) claims that it is being denied certain protection because approval is sought pursuant to § 363(b) instead of as part of a reorganization plan, the objector must specify exactly what protection is being denied. If the court concludes that there has in actuality been such a denial, it may then consider fashioning appropriate protective measures modeled on those which would attend a reorganization plan.

*Continental,* 780 F.2d at 1228.[8]

The Committee does not demonstrate how any specific protection will be lost because the vessel sales will take place pursuant to § 363(b) rather than as part of a reorganization plan, and its complaints are simply a list of virtually every procedural protection afforded by Chapter 11, without a specific explanation of how these

---

**7.** The fact that the sale disposes of essentially all of the assets of the estate does not necessarily disqualify the sale as a *sub rosa* plan. *See Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1312 n. 10 (5th Cir.1985) (citing *Braniff* and stating that "[t]he question whether a sale of all assets may be approved under § 363(b) of course remains open in this circuit."). Several courts have approved the sale of all of an estate's assets under certain circumstances. *See In re Cummins Utility, L.P.,* 279 B.R. 195, 198 (Bankr.N.D.Tex.2002) (approving the sale of all of the debtor's assets because all parties supported it, and the court "was persuaded by the parties that he Debtor's business was rapidly deteriorating"); *In re Condere Corp.,* 228 B.R. 615, 627 (Bankr. S.D.Miss.1998) (approving sale of all debtor's assets because debtor would otherwise run completely out of money in two to four weeks, and "the proposed sale in the instant case is a simple exchange of assets for cash. It is unlike the far reaching terms of the sale the Fifth Circuit objected to in *Braniff*"). The current sales are only exchanges of assets for cash. They do not contain any provisions dictating the terms of any future reorganization plan, preordaining the way creditors will vote on such a plan, or attempting to vary the priorities of Torch's creditors.

**8.** *See also In re San Jacinto Glass Indus. Inc.,* 93 B.R. 934 (Bankr.S.D.Tex.1988) (approving three separate extraordinary sales by the debtor of its property because unsecured creditor failed to demonstrate what protections it had that it was forfeiting).

protections are being denied. *See Cajun Electric,* 119 F.3d at 354, n. 3 (rejecting objecting creditors' *Braniff* argument because the creditors only "listed various procedural protections afforded by Chapter 11" and failed to provide "any indication of how that Committee might lose these protections if the settlement is approved").

The Committee presented general arguments that the assets sales will cause them to lose the ability to receive a disclosure statement, will result in the failure of administrative and tax claims to be paid, will divest them of plan voting rights, and will deprive them of the ability to file a competing reorganization plan. The Committee fails to provide any specific reason why a disclosure statement would be valuable, other than a cryptic reference to "denied discovery," which denial was not appealed. Additionally, although the Committee argues that the "plan process" would require that administrative, priority, and tax claims would have to be paid in full,[9] it fails to explain why this process would be different from what will occur pursuant to the asset sales. The entire argument that the Committee's proposal for its plan of reorganization may afford protections not available in the § 363(b) sales depends on the validity of the assertion that the nine remaining vessels (other than the *Midnight Express* and one small fishing boat) "could then be operated at a profit." This bare assertion has no factual basis in the record.

The arguments reflected in the transcript of the June 8, 2005 bankruptcy court hearing, as well those in the Committee's memorandum on appeal, fail to satisfy the *Continental* requirement that the Committee specify the protections that are being lost. The court finds the sales approved by the bankruptcy court do not exceed the scope of § 363(b). Accordingly, the bankruptcy court's orders approving the sales are affirmed.

### 3. Did the bankruptcy court err in approving the GECC settlement?

On January 20, 2005, GECC filed a motion to lift the automatic bankruptcy stay and to allow it to foreclose on the vessels securing its debt. The debtor reached a settlement agreement with GECC to avoid the foreclosure sale pursuant to which GECC would make an aggregate bid of $18.36 million for the vessels, subject to better offers at an auction sale. The Committee argues that the bankruptcy court's order approving a settlement by the debtor with GECC, and the auction sale to GECC, should be reversed for the additional reason that it is not fair and equitable and fails to survive "strict scrutiny."

■■ Compromises are "a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly." *Cajun Electric,* 119 F.3d at 354. A bankruptcy settlement must be "fair and equitable," and the court must compare "the terms of the compromise with the likely rewards of litigation," considering the probability of success, the complexity and likely duration of the litigation, and any other necessary factors. *Id.* at 356.

■ The court finds that the bankruptcy court properly approved both the settlement between the debtor and GECC and the auction sale to GECC. The GECC motion to lift the stay, if granted, would have resulted in a sale of the GECC collateral by the marshal, a sale without the more extensive publication and marketing efforts that were attendant to the sale

---

**9.** *See* 11 U.S.C. § 1129(a)(9).

ultimately approved by the bankruptcy court. The fairness of the GECC bid was tested through the auction process, and was the highest bid for the vessels at issue. As detailed above, the sales approved by the bankruptcy court do not exceed the scope of § 363(b).

### 4. Is the Committee entitled to a stay pending appeal?

 The Committee has requested, in the event of an adverse ruling, that the court grant a stay pending appeal. Rule 8017(b) of the Federal Rules of Bankruptcy Procedure provides that a district court "may stay its judgment pending an appeal to the court of appeals." In determining whether to issue a stay pending appeal, the court must determine (1) whether the Committee is likely to succeed on the merits, (2) whether the Committee will suffer irreparable injury if the stay is denied, (3) whether other parties will suffer substantial harm if the stay is granted, and (4) whether issuance of the stay will offend the public interest. *In re First South Savings Ass'n,* 820 F.2d 700, 709 (5th Cir. 1987); *In re Babcock & Wilcox Co.,* 2000 WL 1092434, at *2 (E.D.La. Aug.2, 2000).

 The court finds that the Committee is not entitled to a stay pending appeal. The Committee has failed to demonstrate that it is likely to succeed on the merits. Additionally, the Committee has not demonstrated that it will suffer irreparable injury if a stay is not granted. Considering also the harm to the estate if the sales are not allowed to go forward before the deadline of June 30, 2005, the Committee's request for a stay pending appeal is denied.

### C. Conclusions.

The bankruptcy court's orders approving the sales of the debtor's assets under 11 U.S.C. § 363 and the GECC settlement are affirmed. The Committee's request for a stay pending appeal is denied.